```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
 2                     Northern Division

 3   DEREK L. SIMMS

 4            Plaintiff

 5       vs.                          CIVIL ACTION NO:
                                      1:02-CV-3276WMN

 6   ISAIAS TESSEMA, M.D., et al.

 7            Defendants
     _____/

 8

 9            The deposition of JON GALLEY was held
10   on Wednesday, April 7, 2004, commencing at 9:30
11   A.M., at the Western Correctional Institution, 13800
12   McMullen Highway, S.W., Cumberland, Maryland, 21502,
13   before Susan M. Liebrecht, a Notary Public.
14
15   APPEARANCES:
16            COLLEEN M. MALLON, ESQUIRE
              HEATHER D. FOLEY, ESQUIRE
17                On behalf of Plaintiff
18            STEPHANIE LANE-WEBER, ESQUIRE
              DONALD J. CRAWFORD, ESQUIRE
19                On behalf of Defendants
20
21   REPORTED BY:  Susan M. Liebrecht
```

1  assistant warden's position, but primarily
2  responsible for security in the institution.
3      Q    Okay.
4      A    At Montgomery County, it was the warden
5  of the institution, responsible for the overall
6  operation of the local detention center.
7      Q    Okay.
8      A    And before that, I was warden with the
9  Maryland Division of Corrections from 1979 until
10 1993, except for a three-year period when I was
11 Commissioner of Corrections.
12     Q    Okay.  And now you're here at Western
13 Correctional Institution.  What year did WCI open?
14     A    1996.
15     Q    And you're the warden?
16     A    Yes.
17     Q    And what are your -- as warden, what is
18 your role and what are your responsibilities?
19     A    Well, by law, I'm responsible for the
20 overall operation of the institution.  I'm the
21 appointing authority for the staff and the

1    you say problem with the medical director.

2          Q    In a hypothetical, if an inmate has

3    been -- is to receive a certain type of medication

4    and doesn't receive the medication and you're aware

5    of that and the medical director does not believe

6    that the medication should be given to the inmate,

7    but -- this is a convoluted hypothetical.  Let me

8    start over.

9              If an inmate is referred off-site to see

10   a surgeon and the surgeon reasonable degree of

11   medical certainty or prescribes a certain

12   prescription.  The minute made returns to WCI, the

13   medical director does not give that prescription to

14.  the inmate, the inmate complains about it, you learn

15   about that.  What would you do?

16         A    I do not intercede in making medical

17   judgments of a clinical nature.  That's not my

18   prerogative.  I don't have the requisite level of

19   training for that.  I defer to the physician in

20   charge.

21         Q    So, would you follow up with the medical

Page 24

1 director about why he's not prescribing the -- he's

2 not giving the inmate the medication that was

3 prescribed by a surgeon or specialist?

4     A    If it was presented to me as an issue, I

5 would ask the question why, yes.

6     Q    And do you, in that situation, if you're

7 not comfortable with the decision given by the

8 medical director, what do you do?  Can you override

9 what the medical director does?

10     A    No, I would not override what a medical

11 director says because I'm not a doctor.

12     Q    Right.  Do you have the ability to

13 override what the medical director says?

14     A    I would not do that.  I am not a doctor.

15     Q    What if the reason given by the medical

16 director isn't a medical reason why he's not -- he

17 doesn't have a medical justification for not giving

18 the inmate the prescription?  What then?

19     A    If the medical director prescribes or

20 doesn't prescribe, I defer to their judgment.  I

21 have no basis of training to be able to go in and

1   say, no, give him this medication.

2          Q    Right, I understand that, but in my
3   hypothetical, if, for example in Derrick Simms'
4   case, he was referred off-site to see a
5   gastroenterologist because he has Crohn's disease.
6   If a gastroenterologist prescribes a certain
7   medication and he's brought -- Derek Simms is
8   brought back to WCI.

9               The medical director does not give the
10  prescribed medication, for whatever reason. You
11  learn about that, you then contact the medical
12  director to find out what's going on. The medical
13  director cannot give you or doesn't satisfy you in
14  terms of -- doesn't give you any medical reason why
15  he's not giving him if the medication. What would
16  you do in that instance?

17         A    I would not order him to give the
18  medication prescribed by another physician. I have
19  no authority, in my opinion, to do that.

20         Q    Okay. Even if you don't think that
21  absent that medication he's going to be receiving

```
1      Q    Okay.  Have you ever referred an inmate
2  off-site to see a specialist when there hasn't been
3  an emergency?
4      A    No.
5      Q    Okay.  The medical director here, who
6  does he report to?  Does he report the anybody?
7      A    The medical director, Dr. Tessema?
8      Q    Yes.
9      A    He reports administratively to the
10 contract administrator, Nancy Pearson.  And then
11 also to the company's medical director.
12     Q    The company's medical director?
13     A    PHS.  And to the extent that the medical
14 director of the division, Dr. Baucom, gets involved,
15 she has kind of a supervisory relationship over him,
16 as well.  Kind of sort of in terms of peer review.
17     Q    So, he doesn't report to you at all?
18     A    Not on clinical matters.
19     Q    What matters does he report to you on?
20     A    Matters effecting the daily operation of
21 the institution.
```

1   Correctional Institution you do?

2        A       I have the authority to ban any person
3   that works inside that fence for a violation of
4   security procedures.

5        Q       Okay. How many inmates are housed as
6   WCI right now?

7        A       About 1,912.

8        Q       Okay. And of those, how many are housed
9   in single cells for medical reasons?

10       A       Not very many. The bottom section of
11  D Tier in Housing Unit 1, which is 24 cells, are all
12  single celled because WCI is delineated as the
13  institution to house handicapped individuals. And
14  the individuals on that tier, on the bottom of that
15  tier, are typically all wheelchair bound.

16       Q       How many wheelchair bound inmates do you
17  have?

18       A       24. Well, we have 24 cells. I'm not
19  absolutely sure today that we have 24 inmates in
20  wheelchairs on that tier, but they are physically
21  infirmed to some level.

1   as to the number of inmates in the single cells

2   because of medical reasons? I mean, is it 20, less

3   than 20, more than 20?

4        A    Probably between 25 -- well, and then

5   there is the inmates in the infirmary. They're in

6   single rooms.

7        Q    Well, excluding those in the infirmary.

8        A    I would say right now no more than

9   25-ish.

10       Q    Okay. What are the medical reasons --

11       A    Now, let me say, Derek Simms is not in a

12  single cell by order of any medical authority --

13       Q    I understand that.

14            MS. LANE-WEBER: Don't interrupt him,

15  okay?

16            MS. MALLON: Sorry.

17       A    Derek Simms is in a single cell out of

18  consideration of that particular housing unit

19  manager to make his life a little easier and there

20  happened to be a single cell available.

21       Q    I understand and that's one of the

1   wheelchair who are in single cells because of a

2   medical reason because of their physical condition?

3       A    I can't tell you today -- there may well

4   be one or two in Housing Unit 1 that are not in a

5   wheelchair or do not need a wheelchair 24 hours a

6   day, but I can't tell you specifically how many.

7       Q    Okay.

8       A    If you're on that tier you have a

9   physical impairment.

10      Q    Okay.  And what is that tier, again?

11      A    Bottom of D Tier in Housing Unit 1.

12      Q    Okay.  Are you familiar with sick-calls?

13      A    Yeah.

14      Q    How would you describe what a sick-call

15  is?

16      A    Inmates put in a request to go to

17  sick-call.  They are then put on a pass list to go

18  to the dispensary, slash, infirmary area for

19  sick-call.

20      Q    Do you review sick-calls?

21      A    No.

Page 34

```
 1    Q    Have you reviewed Derek's sick-calls?

 2    A    No.

 3    Q    During these MAC meetings or these case

 4  conferences, do you go over sick-calls?  Do you talk

 5  about the sick-calls in regard to the inmate, for

 6  example, in the case conferences?

 7    A    We do not talk about specific inmates.

 8  We talk about the numbers that attend sick-call.

 9    Q    In case conferences?

10    A    In the MAC meetings.

11    Q    Okay.  How about in case conferences?

12    A    No.  We talk about a specific case and

13  what needs to be managed from a variety of

14  departments about that specific case.

15    Q    Okay.  And how do you know what needs to

16  be managed?

17    A    By virtue of what the clinicians who are

18  managing the case tell us.

19    Q    Okay.  Can you describe for me your

20  interaction with the medical staff?  Is it monthly,

21  weekly, daily?
```

1   Q   So, there are three ways, then, that an
2   inmate can complain about medical?
3   A   There is at least three.
4   Q   At least three. What are the other
5   ones?
6   A   Well, you have parents or loved ones
7   call in directly to the medical unit on a regular
8   basis. They call me on a regular basis. They call
9   their case managers and everybody else.
10          You may have inquiries from lawyers
11  about the treatment of an inmate. You might have
12  inquiries from letters they sent to the secretary's
13  office or the commissioner's office that come back
14  down for investigation and handling.
15  Q   Okay. You know who Derek Simms is?
16  A   Yes.
17  Q   And did you know about him before this
18  case was filed?
19  A   I know Derrick Simms is a prolific
20  complainer and has filed many, many, many ARPs. Do
21  I know him personally? No, I do not.

Page 64

1   hear complaints over health care contractors.

2        Q     Right.  So, the medical staff here, is
3   it contracted out with the State?

4             MS. LANE-WEBER:  I'm sorry, would you
5   repeat that?

6             MS. MALLON:  The medical staff here, is
7   it contracted with the State?

8             MS. LANE-WEBER:  Is your question, is
9   the medical staff here provided by a contract which
10  is paid for by the State?  I don't understand the
11  question.  I'm not trying to be difficult.

12       Q     The medical staff, who hired the medical
13  staff that work at WCI?

14       A     Department of Public Safety.

15       Q     Who does the Department of Public Safety
16  have a contract with?

17       A     In this instance, Prison Health
18  Services.

19       Q     So, are all the Prison Health Services
20  employees at WCI, are they -- if a complaint was
21  lodged against any one of them, how would the

Page 66

```
 1        Q     Okay.  Does the ARP process, when you
 2   file an appeal -- but this is the end of the chain,
 3   is it not, so to speak?  When you file an appeal, if
 4   an inmate files a grievance here, a medical
 5   grievance at WCI, this is the last -- they have to
 6   file the appeal all the way up to the Inmate
 7   Grievance Office, correct?  That's the last chain.
 8        A     No, not in my opinion it's not the last
 9   chain.
10        Q     Is it one of the steps in the appeal
11   process that they have to go through?
12        A     Yes, it is.
13        Q     Okay.  This is in regard to Derek's
14   Crohn's disease.  Are you familiar with just Crohn's
15   disease in general?
16        A     Yes.
17        Q     What it is?
18        A     Yes.
19        Q     Would you describe Crohn's disease as a
20   serious condition?  Layman, as a serious condition?
21        A     It is potentially a serious condition
```

1    depending on the individual involved.

2         Q    Do you believe that Crohn's disease can

3    be a painful condition?

4         A    Yes.

5         Q    Do you speak from -- do you have -- is

6    there anybody related to you that has Crohn's

7    disease?

8         A    I have Crohn's disease.

9         Q    Okay.  Are you familiar with perianal

10   Crohn's disease?

11        A    No.

12        Q    Were you aware that before Derek filed

13   the instant Complaint that he believed the medical

14   staff was acting with deliberate indifference to his

15   Crohn's disease?

16        A    I am aware that he used those

17   statements.  He made those statements.

18        Q    Okay.  Were you aware that the staff

19   knew of Derek's Crohn's disease?

20             MS. LANE-WEBER:  What staff?

21             MS. MALLON:  What staff?  Dr. Tessema.

EX 1-13

Page 68

```
 1        A      Yes, I'm aware that they know he has
 2   Crohn's disease.
 3        Q      And you indicated earlier that you had
 4   conversations with, I believe it was Lt. Lancaster,
 5   is that correct, regarding the single cell status,
 6   the single cell issue?
 7        A      Lt. Shreve.
 8        Q      Lt. Shreve.  What was that conversation?
 9   What did Lt. Shreve say to you?
10        A      I inquired as to the housing status of
11   Derek Simms and was informed that he placed Derek
12   Simms in a single cell because, one, he happened to
13   have one available and two, out of consideration for
14   his personal condition, personal medical condition,
15   just to make life easier for him.
16              It was not ordered by the medical
17   department.  It was simply a decision made by the
18   housing unit manager, which he is empowered to do,
19   because he happened to have a single cell available.
20        Q      How many times has that happened before?
21   How many times has a housing unit manager with his
```

Page 80

1    A    No.

2    Q    Is narcotic pain medication as
3    prescribed for a medical reason permitted at Western
4    Correctional Institution?

5    A    Yes, it is.

6    Q    And who at Western Correctional
7    Institution has the authority to prescribe such
8    medication?

9    A    The attending physician.

10   Q    The attending physician?  Is there only
11   one attending physician here at WCI?

12   A    Well, there is a primary physician,
13   which is Dr. Tessema and then there is various
14   specialists that come in such as psychiatrists and
15   whomever.  Dentists.

16   Q    Okay.  And when narcotic pain medication
17   is prescribed to an inmate, what is your
18   understanding of how it would be administered?

19   A    It's a controlled substance.  It is not
20   given out in blister packs.  It is on a watch/take
21   basis and they have to report to the dispensary to

```
 1   take it.  Or if they're in Housing Unit 4, they must
 2   take it under direct -- on a unit dose basis under
 3   direct observation of medical staff.
 4        Q    Did you hear from any of your housing
 5   unit managers that Derek was complaining about his
 6   pain because of his Crohn's disease between 2000 and
 7   2003?  At any time during that period of time?
 8        A    I am aware of statements of his pain
 9   that I can recall in various complaints that he
10   made.
11        Q    Okay.  But you're only aware of that
12   through the complaints that he has filed?
13        A    I think so, yeah.  I mean, I can't
14   recollect any discussions specifically about pain.
15        Q    Okay.  Are you aware of how many inmates
16   currently take narcotic pain medication?
17        A    No.
18        Q    Do you have an estimate?
19        A    The last statistics indicated that there
20   were about nine percent of the population taking
21   psychotropics which are abusable drugs.  How many
```

1    Q    Would another option to be to refer to
2    send the inmate off-site to a specialist or surgeon?
3    A    That's another possible option.
4    Q    Okay. Is it unusual for a medical
5    director at one institution, for example, in this
6    case the Maryland House Annex, the document,
7    Deposition Exhibit 5, which recommends that Derek
8    Simms be placed in a single cell because of his
9    medical condition, is that unusual for that
10   recommendation not to carry over to the receiving
11   institution?
12   A    No, it's not unusual.
13   Q    How often does that happen?
14   A    Frequently.
15   Q    Is it appropriate for a housing unit
16   manager to take an otherwise healthy inmate and
17   place that inmate in a single cell if a single cell
18   is available?
19   A    It depends on the circumstances involved
20   and what that housing unit manager is facing in the
21   way of day-to-day management of that unit.

1         CERTIFICATE OF DEPONENT

2

3        I hereby certify that I have read and

4   examined the foregoing transcript, and the same

5   is a true and accurate record of the testimony

6   given by me.

7        Any additions or corrections that I feel

8   are necessary, I will attach on a separate sheet

9   of paper to the original transcript.

10

11

12                          _____
                              JON GALLEY

13

14

15

16

17

18

19

20

21