```
                                                                  Page 1
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                    Northern Division

 3    DEREK L. SIMMS

 4           Plaintiff

 5      vs.                              CIVIL ACTION NO:
                                         1:02-CV-3276WMN

 6    ISAIAS TESSEMA, M.D., et al.

 7           Defendants
      _____/

 8

 9              The deposition of MICHAEL WEINSTEIN,

10    M.D. was held on Monday, May 3, 2004, commencing at

11    4:20 P.M., at the Law Offices of Adelman, Sheff &

12    Smith, LLC, 200-A Monroe Street, Suite 310,

13    Rockville, Maryland, 20850, before Susan M.

14    Liebrecht, a Notary Public.

15

16    APPEARANCES:

17           COLLEEN M. MALLON, ESQUIRE
             HEATHER DEANS FOLEY, ESQUIRE
18              On behalf of Plaintiff

19           DAVID KENNEDY, ESQUIRE (via telephone)
             DONALD J. CRAWFORD, ESQUIRE
20              On behalf of Defendants

21    REPORTED BY:  Susan M. Liebrecht
```

Page 46
1          THE WITNESS:  These are just some rough
2  notes with dates.
3      Q     Right, okay.  So, from February of 2000
4  to August of 2003 do you believe that the
5  Plaintiff's complaints were or were not ignored?
6      A     I don't think they were ignored.
7      Q     And state the basis for that opinion.
8      A     Multiple visits.
9      Q     Visits to whom?  To where?
10     A     From 2000 to 2003?
11     Q     February of 2000 to August of 2003.
12     A     I believe during that time he had
13 visits -- he saw Dr. Tessema.  There is another
14 signature that I can't make out, I believe from a
15 nurse, and I think during that time he was seen at
16 the University of Maryland, as well.
17     Q     During that period of time?
18     A     I believe so.  I may be wrong on the
19 dates.
20     Q     Do you believe that the period of time
21 during February of 2000 and August of 2003, during

Page 47
1  that period of time when he was seen by Dr. Tessema
2  or these other nurses that you referred who work at
3  Western Correctional Institution, do you believe
4  that those were meaningful evaluations?
5      A     From February of 2000 to --
6          MR. CRAWFORD:  Please define what you
7  mean by meaningful.
8      Q     From February of 2000 to August of 2003.
9          MR. CRAWFORD:  Again, I reiterate the
10 question.  What do you mean by meaningful?
11         MS. MALLON:  Well, I'll let the doctor
12 answer the question the best he can.
13     A     I think the people that he saw during
14 that period of time made an effort to evaluate him
15 as health care providers.  So, they were meaningful,
16 yes.
17     Q     You state in your report that the
18 Plaintiff's response to recommendations varied at
19 times because of the condition's natural course and
20 the Plaintiff's compliance with treatment.
21         Is it your opinion that the Plaintiff

Page 48
1  was or was not compliant with his treatment?
2      A     I think he was both compliant and
3  non-compliant with his treatment depending upon the
4  month or week or whatever.  It did not appear that
5  he was consistently compliant with his treatment.
6      Q     And what's the basis of that opinion?
7      A     There are notes in there about him not
8  doing sitz baths.  There are notes in there about
9  him running out of medication, of not wanting to do
10 certain types of treatments versus other types of
11 treatments.
12     Q     Do you know the reason for these alleged
13 non-compliances?  The reason why he was not being
14 complaint?
15     A     No, I don't.
16     Q     Did you talk with Dr. Tessema at all
17 about the Plaintiff's so-called noncompliance with
18 his treatment?
19     A     No, I did not.
20     Q     Did you talk with anybody about that
21 topic?

Page 49
1      A     No.
2      Q     So, your opinion that the Plaintiff was
3  non-compliant at times is based on the records that
4  you reviewed?
5      A     Yes.
6      Q     In your report you state that you do not
7  believe that the treatment provided at any time was,
8  quote, so grossly incompetent or inadequate that it
9  shocks the conscience and constitutes the willful
10 infliction of pain, end quote.
11         Why is that in quotation marks?
12     A     I think that's a definition that I saw
13 in one of the complaints.  It is a quote.  It's from
14 one of the complaints.
15     Q     And --
16     A     Legal complaints.
17     Q     Okay.  So, you also reviewed the
18 pleadings in this case?
19     A     It was in the records that I was
20 provided.
21     Q     Okay.  So, the records that you were

Page 50

1  provided were not only the medical records, but they
2  were the pleadings in the case?  The Complaint --
3       MR. CRAWFORD:  The Complaint and Answer.
4   Q   Did you have discussions with defense
5  counsel as to what this expression that's in
6  quotation marks in your report means?
7   A   I did talk to him, originally, about how
8  that related to the issue because it's a
9  correctional facility and whether or not the
10 complaint was a malpractice complaint, which is
11 more, obviously, the experience that I've had.
12 Whether or not this complaint is somehow different
13 than a malpractice complaint.
14      Because that was not a phrase that I
15 would have seen in a previous malpractice, you know,
16 in a malpractice complaint.  So, I tried to
17 understand the correctional issue versus more
18 standard malpractice complaint.
19  Q   What's your understanding of that?
20  A   Well, he explained to me that with a
21 correctional complaint, that that was the phrase

Page 51

1  that was used and that this wasn't -- this would not
2  be sort of a standard -- you know, it would not be
3  the same sort of language used in a malpractice
4  complaint.
5   Q   What does this phrase, what does this
6  expression, mean to you?
7   A   You know, I interpreted it along the
8  lines of a breach in the standard of care, which
9  would be a more typical phrase that you would see in
10 a malpractice case.
11      But having to do more with a
12 correctional institution in that the patient,
13 obviously, does not have full freedom to seek
14 medical care of his own choosing so that --
15  Q   And who told you that?
16  A   Well, who told me?  Nobody told me.
17  Q   Okay.  That's just your --
18  A   That was my impression, yes.
19  Q   Okay.  Go on.
20  A   Yeah.  My impression is that I didn't
21 think that all inmates were entitled to choose any

Page 52

1  physician that they wanted to as you would be able
2  to go to Hopkins or Mass General or Mayo Clinic, I
3  didn't think he would probably have access to any
4  specialist he chose.  That there would be some
5  restrictions.
6   Q   Okay.  Did you finish explaining what
7  you believe this phrase to mean?
8   A   I interpreted it as essentially meaning
9  a breach in the standard of care.
10  Q   And what does that mean?  A breach in
11 the standard of care?  What standard of care?
12  A   What a reasonable physician would do
13 with reasonable information.
14  Q   Okay.  Are you aware that the Plaintiff
15 was not seen by a gastroenterologist or
16 gastroenterological surgeon?  Do you know what I
17 mean by that?
18  A   I do.
19  Q   For a consecutive 42 months in February
20 of 2000 or August of 2003?  Are you aware of that?
21 That he was not seen?

Page 53

1   A   Correct.
2   Q   Okay.  Is it still your opinion that the
3  treatment provided at any time by the Western
4  Correctional Institution medical staff to the
5  Plaintiff was not so, quote, grossly incompetent or
6  inadequate that it shocks the conscience and
7  constitutes the willful infliction of pain even
8  though the Plaintiff was not referred to a GI or a
9  GI surgeon, or any specialist for that matter, for a
10 consecutive 42 months beginning from February 2000
11 to August of 2003 when the Plaintiff made over 80
12 complaints, at least 80 complaints, relating to --
13 complaints of pain relating to his perianal Crohn's
14 disease?
15  A   I just want to review of some to the
16 records.
17  Q   Sure.
18  A   Just give me a second.
19  Q   Okay.
20  A   Because I'm a little confused about the
21 dates.

Page 54

1  Q  Okay.
2  A  Okay. Just repeat the question, again.
3  Q  Is it still your opinion that the
4  treatment provided at any time by the Western
5  Correctional Institution medical staff to the
6  Plaintiff was not so grossly incompetent or
7  inadequate that it shocks the conscience and
8  constitutes the willful infliction of pain, even
9  though the Plaintiff was not referred to a GI or GI
10 surgeon, or any specialist for that matter, for a
11 consecutive 42 months beginning from February, 2000
12 until August, 2003 and during this period of time
13 Plaintiff made at least over 80 complaints relating
14 to his disease and the pain thereto?
15 A  Reviewing the records from that rough
16 period of time, I don't see that there was anything
17 that shocks me about what was prescribed or any
18 notes made during that time.
19 Q  The question, Dr. Weinstein is: Is it
20 still your opinion that the treatment provided at
21 any time by the Western Correctional Institution

Page 55

1  medical staff to the Plaintiff was not so grossly
2  incompetent or inadequate that it shocks the
3  conscience and constitutes the willful infliction of
4  the pain, even though the Plaintiff was not referred
5  to a GI or GI surgeon, or specialist for that
6  matter, for a consecutive 42 months?
7      That's a yes or no answer.
8  A  No, I am not -- I don't believe it
9  shocks the conscience.
10 Q  Yet in your report, Dr. Weinstein, you
11 say that a specialist follow-up every three to four
12 months seems reasonable.
13     Explain why --
14 A  If needed. Depending upon how the
15 patient is doing and the physician's assessment of
16 whether or not the disease is active, in a patient
17 with active disease, I would expect a follow-up in
18 private practice here in the Mid-Atlantic area about
19 every three or four months.
20     If the physician did not feel that there
21 was anything to refer the patient for and it was his

Page 56

1  impression that the complaints were complaints and
2  not related to active disease, I would not be
3  wanting to see the patient in follow-up if there was
4  nothing to see.
5  Q  So, for this three-year period, given
6  the Plaintiff's history and given his constant
7  complaints of pain, you don't think that he should
8  have been seen by a gastroenterologist or a
9  gastroenterological surgeon?
10 A  I think he probably should have been
11 seen. It would have saved everybody a lot of
12 trouble. Would anything have been different --
13 Q  That's not my question. How often do
14 you think he should have been seen?
15 A  By a specialist?
16 Q  Yes.
17 A  I would have left that up to the
18 specialist.
19 Q  Okay. But he would have had to have
20 seen a specialist in order for that specialist to
21 make that opinion, correct?

Page 57

1  A  Correct.
2  Q  You indicated earlier that it was not --
3  in your opinion, it was not so grossly incompetent
4  or inadequate that it shocks the conscience and
5  constitutes the willful infliction of pain that the
6  Plaintiff was not referred off-site from February of
7  2000 --
8      MR. CRAWFORD: Asked and answered.
9  Q  -- to August of 2003 to see a GI or GI
10 surgeon.
11     MR. CRAWFORD: Asked and answered.
12 Q  How would you characterize the failure
13 to send the Plaintiff off-site during that period of
14 time?
15 A  I would interpret that, in looking at
16 the notes, that there wasn't anything to seek an
17 opinion about. That the way the disease appeared to
18 be, an assessment of the activity, was that there
19 was nothing to seek an opinion about.
20 Q  And the assessment was based on -- what
21 was the assessment based on?

Page 78

1  during his deposition?
2  A   Not that specific quote.
3  Q   I also asked Dr. Tessema whether he ever
4  stated that the Plaintiff -- whether he, whether
5  Dr. Tessema, ever stated that the Plaintiff was
6  seeking narcotics. And he answered, no.
7      Are you familiar with that testimony
8  from reviewing the transcript?
9  A   I would have to review the records.
10 Q   Okay. Are you familiar with how
11 narcotic medication would be given to the Plaintiff
12 at Western Correctional Institution?
13 A   Not specifically, no.
14 Q   Are you aware that it's a watch and
15 take?
16 A   I would -- I'm not aware. You just told
17 me.
18 Q   Okay. Are you aware that the Plaintiff
19 is under constant supervision if given a narcotic to
20 ingest? Were you aware of that?
21 A   You just told me.

Page 79

1  Q   Okay. Are you aware from the
2  Plaintiff's medical records that the Plaintiff was
3  previously prescribed narcotic pain medication while
4  at Western Correctional Institution?
5  A   Yes.
6  Q   Does the fact that narcotic pain
7  medication at WCI is administered by watch and take
8  and that it's under the constant supervision of
9  staff at WCI, does that change your opinion any as
10 to --
11 A   No. I noticed that he was prescribed
12 analgesics, particularly at times when --
13 Q   Analgesics? They can be non-narcotic
14 and narcotic?
15 A   Narcotic. He was prescribed narcotic
16 analgesics at times related to abscess drainage
17 procedures. He received Percocet or Darvocet or
18 other narcotic analgesics at times. And at other
19 times, they were not prescribed because they were
20 not felt to be necessary based upon the physician's
21 or health care provider's assessment.

Page 80

1      Short periods of narcotics are very
2  reasonable for specific reasons. Long-term use of
3  narcotics is a problem.
4  Q   But short-term narcotics in this
5  situation?
6  A   He was prescribed short-term narcotics.
7  Q   When was he prescribed short-term
8  narcotics?
9  A   I'd have to look at the dates.
10 Q   Do you think that's reasonable?
11 A   Short-term narcotics?
12 Q   Yes.
13 A   Absolutely.
14 Q   Okay. You state that you rarely
15 prescribe chronic narcotics to patients with Crohn's
16 diseases.
17     Have you ever prescribed -- you rarely
18 have, you say that you rarely have. When you have
19 prescribed chronic narcotics to patients with
20 Crohn's disease, what are your reasons for doing so?
21 A   Postoperatively. I use narcotics in

Page 81

1  patients who are postoperative. I've used narcotics
2  in patients who have had orthopaedic complications
3  from treatments of Crohn's disease.
4      Short-term whenever possible, long-term
5  very reluctantly because they don't work and
6  occasionally have withheld them from patients who
7  have abused narcotics, abused my prescriptions of
8  narcotics.
9  Q   Okay. Have you prescribed short-term
10 narcotics to patients, to your patients, who have
11 presented with similar symptoms as the Plaintiff's
12 symptoms?
13 A   I have.
14 Q   Are narcotic analgesics more expensive
15 than non-narcotic analgesics?
16 A   No.
17 Q   Okay.
18 A   Significantly cheaper, actually.
19 Q   Narcotic analgesics?
20 A   Are cheap, pennies.
21 Q   In your report you state that the

Page 86

1    A    It would appear that during the last
2 year or so he has had less problems with drainage
3 than he had for other periods of time back in the
4 late '90's. That he has concentrated, actually,
5 more on other complaints besides his perianal
6 complaints.
7    Q    Okay.
8    A    So, it appears that this is less of an
9 issue now. Other issues seem to be more complaints.
10   Q    Isn't it possible that such improvements
11 might have occurred back in February, 2000 or during
12 that consecutive 42-month period if Plaintiff had
13 been seen by a GI or a GI surgeon? Is it possible?
14   A    Is it possible?
15   Q    Uh-huh.
16   A    Sure, it's possible.
17   Q    In your report you say that the
18 Plaintiff might be benefiting from the spontaneous
19 improvement of Crohn's disease.
20   A    Correct.
21   Q    What's the basis for that opinion?

Page 87

1    A    Because that happens, as well. Based
2 upon my experience with other patients with Crohn's
3 disease.
4    Q    With the history like the Plaintiff's?
5    A    Correct.
6    Q    With perianal Crohn's disease?
7    A    Correct.
8    Q    In your report, Dr. Weinstein, you state
9 that there is no recent documented complaints or
10 findings presently that suggest the need for a
11 private cell or narcotic medication.
12        What do you mean when you say no recent
13 documented complaints or findings?
14   A    I was looking at the notes by the health
15 care providers, most recent notes that I saw, which
16 were from, I guess, January, February of this year.
17   Q    Okay. How about the Plaintiff's
18 complaints?
19   A    Of?
20   Q    Pain.
21   A    Again, pain is --

Page 88

1    Q    Rectal pain.
2    A    If we're just talking about pain, the
3 question is what kind of physical findings are there
4 to go with the pain that might require some
5 different treatment than what you're seeing.
6        I think pain is a tough complaint to
7 treat in and of itself if there is no physical
8 findings to justify any need to change treatment.
9        Pain would not be the sole reason I
10 would change my treatment in a patient with Crohn's
11 disease. If everything else I saw looked stable, I
12 would not change the treatment.
13   Q    Would you do anything else to try to
14 alleviate the rectal pain?
15   A    I might consider a pain specialist, I
16 might consider drugs like Elavil or some other pain
17 relief issue, psychiatric consultation.
18   Q    Would you consider short-term narcotics?
19   A    No.
20   Q    Private cell. Are you familiar with
21 prison cells at Western Correctional Institution?

Page 89

1    A    No.
2    Q    Are you familiar with any cells?
3    A    Let me retract that. I have some
4 understanding of this cell based upon, I think, some
5 descriptions in the notes about what a cell is.
6        Bunk bed, commode, small sink. And I
7 believe that's in the records.
8    Q    Okay. What is the basis for your
9 opinion that the Plaintiff does not need a private
10 cell?
11   A    It has to do with what activities, you
12 know, what is going on with the patient that would
13 require isolation. Active drainage -- you know, my
14 interpretation of why a patient, this patient or any
15 other patient, needs to be isolated has to do with
16 mostly infection control rather than Crohn's control
17 or pain control. So, it's infection control.
18        If there is active drainage that cannot
19 be contained that might contaminate another patient,
20 that would be a concern and a reason to possibly
21 isolate the patient.

Michael Weinstein, M.D. - 5/03/04

Page 90

1   So, it's more protecting -- as much
2   protecting other patients as it is any benefit for
3   the patient that I'm treating.
4       Q   The Plaintiff, did he have active
5   drainage issues back in the late '90's?
6       A   I believe so.
7       Q   Are you aware that sitz baths, you said
8   it earlier, have been prescribed to treat the
9   Plaintiff's condition?
10      A   Yes.
11      Q   What are your thoughts regarding the use
12  of or the prescription of a sitz bath to treat the
13  Plaintiff's condition?
14      A   Appropriate. Very appropriate for
15  treating this type of problem.
16      Q   How about the water temperature? In
17  terms of does the temperature need to be a
18  certain --
19      A   We usually tell the patients to make the
20  water hot, but don't burn yourself.
21      Q   But as hot as they can --

Page 91

1       A   You know, make the water hot.
2       Q   Okay.
3       A   There is no specific temperature that
4   I've ever prescribed.
5       Q   How about salt, the use of salt in sitz
6   baths. Are you familiar with that?
7       A   You know, I usually don't prescribe
8   salts.
9       Q   For a patient with perianal Crohn's
10  disease?
11      A   Correct.
12      Q   Why is that?
13      A   I don't think that they really do very
14  much. I don't think there is a lot of evidence that
15  the salts do that much for treating the condition.
16      Q   Okay. Do you have an opinion as to
17  whether the Plaintiff's perianal Crohn's disease was
18  in remission in January of 2000?
19      A   I'd have to look specifically at those
20  dates and the notes at that time. How active it was
21  in January of 2000?

Page 92

1       Q   Whether it was in remission.
2       A   I don't think -- I'm not sure he's ever
3   been completely in remission.
4       Q   Okay.
5       A   It's has he been controlled.
6       Q   If a patient with perianal Crohn's
7   disease has drainage, obviously then the patient --
8   well, the patient's condition, is it in remission?
9       A   No.
10      Q   I mean, how would you characterize that?
11  Is it active, less active? If there is drainage.
12      A   If it's draining, it's active.
13      Q   Okay. During Dr. Tessema's deposition
14  he testified that he didn't see any objective
15  manifestations of the Plaintiff's pain. He
16  evaluated the patient and he tried to see if there
17  were any other ailments that could cause his
18  complaints of pain. And he indicated that there was
19  none other than the perianal Crohn's disease.
20          The Plaintiff in this case, he's still
21  continued to complain. So, given the lack of

Page 93

1   objective manifestations of pain, the fact that the
2   Plaintiff repeatedly complained of pain, what is
3   your opinion as to whether the Plaintiff should have
4   been seen by a specialist in that situation?
5       A   For pain or for Crohn's?
6       Q   For pain, first.
7       A   Should he have been seen by a pain
8   specialist?
9       Q   Yes.
10      A   I would have considered consultation
11  with somebody who might have dealt with the pain
12  issue, either from a chronic pain, from a pain
13  narcotic seeking behavior issue, psychiatric issue.
14          Again, because I'm not a specialist in
15  pain treatment or narcotic abuse.
16      Q   Right. How about for his, for the
17  Plaintiff's, perianal Crohn's disease?
18      A   If I felt it was under control with the
19  treatments I was prescribing, that what I was seeing
20  was in reasonable control, I would -- should he have
21  sought a consultation?

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

Michael Weinstein, M.D. - 5/03/04

Page 94

1  Q  Yes.
2  A  CYA?  That is, for a cover your ass
3  reason?
4  Q  Yes.
5  A  It probably would have been helpful.
6  Would the treatment have been any different?  Not
7  likely.
8  Q  Why is that?  How do you know that if
9  you don't try it?
10  A  You asked me my opinion.
11  Q  Okay.
12  A  I think, based in retrospect, based upon
13  follow-up evaluations of not having had any other
14  evidence of Crohn's disease outside of the perineal
15  area, I don't think that there really was any other
16  treatment that would have necessarily made any
17  difference.
18      It's maybe easier for me to say in
19  retrospect that the treatment that was provided was
20  reasonable.  It's fortunate that in retrospect it
21  was reasonable.  On the other hand, if it had not

Page 95

1  been going according to what Dr. Tessema was
2  expecting, I assume he would have consulted.
3      So, I think he didn't consult because
4  what he was seeing was what he expected.
5  Q  What changed?  In your opinion, what
6  changed from February of 2000 to August of 2003
7  which would have -- which warranted at that time
8  Dr. Tessema referred the Plaintiff off-site to see a
9  specialist?
10  A  When was the first complaint made?  No,
11  legal complaint made?
12  Q  In May of 2003.
13  A  So, it was a cover your ass
14  consultation.
15  Q  Okay.
16  A  Not necessarily based upon any change in
17  the patient's condition, but hey, I react to legal
18  complaints, too.
19  Q  Eight times he was seen off-site.
20  A  I take legal complaints pretty
21  seriously.  I want lots, lots, of people looking

Page 96

1  over my shoulder.  Even though I may be absolutely
2  sure of what I'm doing, I'll have some other people
3  behind me in case we get anywhere.  Because that's
4  just the nature of the beast.
5  Q  Do you disagree with Dr. Lee's opinion
6  that the Plaintiff did not receive proper evaluation
7  and treatment for his perianal Crohn's disease from
8  February, 2000 until August of 2003?
9  A  I think that -- do I disagree -- say
10  that again?
11  Q  Do you disagree with Dr. Lee's opinion
12  that the Plaintiff did not receive proper evaluation
13  and treatment for his perianal Crohn's disease from
14  February, 2000, until August of 2003?
15  A  I'm not sure what proper means.  What
16  she means by proper.
17      Does it mean that the patient didn't see
18  her and that's her definition of proper, the patient
19  wasn't seen by a higher institution and that's her
20  definition of proper or the patient was seen by a
21  physician who felt comfortable treating the

Page 97

1  condition.
2      If her opinion is that the patient
3  wasn't seen by a physician, I think I would
4  disagree.  I would agree with her that I would have
5  liked to have seen the patient as a specialist, as
6  well.
7      So, I would agree with her that it
8  wasn't proper in that I'm a specialist and I like to
9  see these patients.
10     That's confusing, I'm sorry.  I'm not
11  sure what her definition of proper is.
12  Q  Well, do you have an opinion as to
13  whether it was proper that the Plaintiff was not
14  seen by a GI, a GI surgeon or specialist from
15  February of 2000 until August of 2003?
16  A  I think if there was no -- if the health
17  care provider did not feel that there was any need
18  for a specialist consultation, I think that's
19  perfectly proper.
20  Q  Given the Plaintiff's history?
21  A  Given the patient's history, depending

25 (Pages 94 to 97)