Jon Galley - 4/7/04

Page 1

1              IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MARYLAND

2                    Northern Division

3    DEREK L. SIMMS

4              Plaintiff

5        vs.                      CIVIL ACTION NO:

                                  1:02-CV-3276WMN

6    ISAIAS TESSEMA, M.D., et al.

7              Defendants

     _____/

8

9              The deposition of JON GALLEY was held

10   on Wednesday, April 7, 2004, commencing at 9:30

11   A.M., at the Western Correctional Institution, 13800

12   McMullen Highway, S.W., Cumberland, Maryland, 21502,

13   before Susan M. Liebrecht, a Notary Public.

14

15   APPEARANCES:

16            COLLEEN M. MALLON, ESQUIRE

              HEATHER D. FOLEY, ESQUIRE

17               On behalf of Plaintiff

18            STEPHANIE LANE-WEBER, ESQUIRE

              DONALD J. CRAWFORD, ESQUIRE

19               On behalf of Defendants

20

21   REPORTED BY:  Susan M. Liebrecht

EXHIBIT

10

Jon Galley - 4/7/04

Page 30

1   Q    Okay. So, can you --
2   A    In addition --
3   Q    Go on.
4   A    In addition to that, there is the first
5   housing unit of what will be the new institution,
6   North Branch. That is a single cell housing unit
7   that when -- that houses 256 inmates, but none of
8   those are for medical reasons. It's the design of
9   that institution to be single cell.
10        And then there are some few others. For
11  example, Derek Simms, that's in a single cell on the
12  PC Tier in Housing Unit 4. Housing Unit 4 is a
13  special management unit.
14  Q    That's because it's PC?
15  A    It's a variety of things. It's
16  disciplinary segregation, it's administrative
17  segregation and it's PC.
18  Q    Derek is there because of his protective
19  custody status?
20  A    Yes.
21  Q    Okay. So, you don't have any estimate

Page 31

1   as to the number of inmates in the single cells
2   because of medical reasons? I mean, is it 20, less
3   than 20, more than 20?
4   A    Probably between 25 -- well, and then
5   there is the inmates in the infirmary. They're in
6   single rooms.
7   Q    Well, excluding those in the infirmary.
8   A    I would say right now no more than
9   25-ish.
10  Q    Okay. What are the medical reasons --
11  A    Now, let me say, Derek Simms is not in a
12  single cell by order of any medical authority --
13  Q    I understand that.
14       MS. LANE-WEBER: Don't interrupt him,
15  okay?
16       MS. MALLON: Sorry.
17  A    Derek Simms is in a single cell out of
18  consideration of that particular housing unit
19  manager to make his life a little easier and there
20  happened to be a single cell available.
21  Q    I understand and that's one of the

Page 32

1   reasons why this case was brought. Because there
2   isn't a medical order.
3        What are the medical reasons why -- that
4   warrant an inmate having a single cell? Are you
5   aware what those medical reasons are?
6   A    For anybody that's on the bottom of
7   D Tier in Housing Unit 1, it's because of their
8   physical condition. If you're on the bottom of that
9   tier, you're automatically in a single cell.
10       Beyond that, it's a matter for the
11  medical director as part of his prescribed
12  treatment. And we will, to the best of our ability,
13  accommodate a single cell.
14  Q    And the physical condition, can you
15  elaborate on that? You said there are a number of
16  the inmates that are in single cells because of
17  their physical condition. Can you elaborate on
18  that?
19  A    They have physical impairments.
20  Primarily in a wheelchair.
21  Q    Okay. Are there any who aren't in a

Page 33

1   wheelchair who are in single cells because of a
2   medical reason because of their physical condition?
3   A    I can't tell you today -- there may well
4   be one or two in Housing Unit 1 that are not in a
5   wheelchair or do not need a wheelchair 24 hours a
6   day, but I can't tell you specifically how many.
7   Q    Okay.
8   A    If you're on that tier you have a
9   physical impairment.
10  Q    Okay. And what is that tier, again?
11  A    Bottom of D Tier in Housing Unit 1.
12  Q    Okay. Are you familiar with sick-calls?
13  A    Yeah.
14  Q    How would you describe what a sick-call
15  is?
16  A    Inmates put in a request to go to
17  sick-call. They are then put on a pass list to go
18  to the dispensary, slash, infirmary area for
19  sick-call.
20  Q    Do you review sick-calls?
21  A    No.

9 (Pages 30 to 33)

Jon Galley - 4/7/04

Page 38

1    Q    Okay.
2    A    If an inmate is dissatisfied with that
3    treatment for whatever reason they have a variety of
4    ways to complain about that treatment.  One of which
5    is an ARP.
6    Q    Okay.  What are the other ways they can
7    complain about the treatment?
8    A    They write letters to the unit manager.
9    They write letter to Ms. Pearson.  They write
10    letters to me, the assistant warden, their case
11    manager, the chief of security.
12         The housing unit managers interview them
13    regularly.  They intercede directly.  If it's an
14    issue, any given issue, that they don't feel they
15    can handle or not getting satisfaction to their
16    satisfaction out of, they will buck it on up the
17    chain of command to the chief of security, to the
18    assistant warden, to myself.
19         And then there is also the third
20    mechanism to air grievances is the Inmate Grievance
21    Commission, itself.

Page 39

1    Q    So, there are three ways, then, that an
2    inmate can complain about medical?
3    A    There is at least three.
4    Q    At least three.  What are the other
5    ones?
6    A    Well, you have parents or loved ones
7    call in directly to the medical unit on a regular
8    basis.  They call me on a regular basis.  They call
9    their case managers and everybody else.
10         You may have inquiries from lawyers
11    about the treatment of an inmate.  You might have
12    inquiries from letters they sent to the secretary's
13    office or the commissioner's office that come back
14    down for investigation and handling.
15    Q    Okay.  You know who Derek Simms is?
16    A    Yes.
17    Q    And did you know about him before this
18    case was filed?
19    A    I know Derrick Simms is a prolific
20    complainer and has filed many, many, many ARPs.  Do
21    I know him personally?  No, I do not.

Page 40

1    Q    You say prolific complainer.  Is this as
2    compared to other inmates here?
3    A    Yes.
4    Q    How many more complaints has he lodged,
5    just relative?
6    A    I don't know.  Derek -- I see Derek's
7    name a lot in comparison to many other inmates.
8    Q    And you see Derek's name in connection
9    with medical complaints?
10    A    Medical complaints, housing issues.
11    Q    Is the vast majority, though, dealing
12    with his medical complaints?
13    A    I don't know.  I don't know that I can
14    answer that completely without looking at the
15    records of all.
16    Q    Other than him being a prolific
17    complainer, what type of inmate is he?  Does he have
18    any -- is he cooperative?  I mean, has he faced
19    disciplinary, you know?
20    A    I'm sure he has some disciplinary
21    reports.  I can't, without going to the record and

Page 41

1    checking, tell you that he does or he doesn't and if
2    he does, how many.  To the best of my knowledge,
3    he's not a behavioral problem.
4    Q    Right, okay.
5         MS. LANE-WEBER:  Off the record just for
6    a moment.
7         MS. MALLON:  Sure.
8         (A discussion was held off the record.)
9         MS. LANE-WEBER:  Go back on the record.
10    Thanks.
11    Q    Are you aware that Derek has Crohn's
12    disease?
13    A    I am now through this lawsuit.  I don't
14    know that I was aware before now.  And now means a
15    matter of months ago.  Ever since I reviewed the
16    detail of this legal issue.
17         MS. MALLON:  Okay.  I'm going to show
18    you what I'd like to be marked as Deposition Exhibit
19    Number 1.  And I have a copy for you, too, and I
20    highlighted this just for ease.
21         (A discussion was held off the record.)

11 (Pages 38 to 41)

Jon Galley - 4/7/04

Page 42

1          (Plaintiff Deposition Exhibit Number 1
2    was marked for purposes of identification.)
3          Q     Can you say when this is dated?
4    Indicate to the court reporter when this was dated,
5    when this Deposition Exhibit Number 1 is dated,
6    Warden Galley?
7          A     January 7, 2002.
8          Q     Okay.  Did this -- it says this was --
9    it looks like, it says:  Circle one.  And it's to
10   the warden.
11         Would this type of inmate request have
12   been seen by you?
13         A     Not necessarily.
14         Q     Okay.
15         A     Many of these requests that come in get
16   referred directly to the housing unit manager, the
17   case manager or the medical unit, depending on what
18   the nature of the problem is.
19         Q     Okay.  Well, how would whomever follow
20   up with this type of complaint?
21         A     How would it be followed up?

Page 43

1          Q     Right.  Who would follow up?
2          A     To whomever it was directed.  If it was
3    directed to the medical unit, I would expect the
4    medical unit to follow up with it.
5          Q     Right.  This seems to be as though it
6    was directed to warden.  And in January, 2002 were
7    you the warden?
8          A     Yes.
9          Q     Okay.
10         A     I don't recall ever seeing this and many
11   of these reports that come in I don't see.  They are
12   automatically routed out to whoever by my
13   administrative aid.
14         Q     Okay.  And would the administrative aid
15   follow up with this type of complaint?
16         A     Followed up in terms of routing slips
17   are put on all of these kinds of things and they
18   come back with notes on from whomever it was
19   referred to indicating what was done.
20         Q     And who would sign off on indicating
21   what was done?

Page 44

1          A     Whomever it was referred to.  If it went
2    to the medical unit, they would put a note on what
3    they did as a result of this complaint and send it
4    back for our files.
5          Q     Okay.  And when it went back to your
6    files, I'm just trying to figure out what would
7    happen.  If they sent this to medical to figure out
8    what is going on and they get no response back from
9    medical, would there be documentation as to this
10   issue has been resolved or this matter has been
11   addressed, this issue has been addressed?
12         A     Finished?
13         Q     Yes.
14         A     Their note would typically indicate what
15   they did.  I review, not necessarily every one of
16   those that come back, simply because of the sheer
17   volume, but I do regular spot checks of the returns
18   to see what the response was and what they did.
19         Q     Okay.  And if you don't review them, who
20   does review them in your stead?
21         A     The assistant warden could be involved

Page 45

1    in it.  The chief of security could be involved in
2    it.  Ms. Newland can be involved in it.  She's the
3    contract administrator.
4          MS. MALLON:  Okay.  I'd like to mark
5    this as Deposition Exhibit 2.
6          (Plaintiff Deposition Exhibit Number 2
7    was marked for purposes of identification.)
8          Q     The item I just handed to you, which has
9    been marked as Deposition Exhibit 2 is a Maryland
10   Division of Correction Request for Administrative
11   Remedy.
12         It's to, and there is a check next to
13   warden of institution.  In Part A, inmate request.
14   The inmate making the request is Derek L. Simms and
15   it's dated January 9, 2000.  And then Part B is the
16   response and is that your name, Warden Galley?
17         A     Yes, it is.
18         Q     And the date on that?  Please provide
19   the date on that that you signed?
20         A     February 8, 2000.
21         Q     Okay.  And can you describe for me when

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

Jon Galley - 4/7/04

Page 46

1  you write, I'm assuming this is you writing this?
2  Is this not you writing this is in Part B?
3      A    Did I write this in Part B?
4      Q    Yes.
5      A    No, I did not.
6      Q    Did you review it?
7      A    Yes.
8      Q    Before you signed it?
9      A    Yes.
10     Q    Okay.  The second sentence says:  An
11 investigation.  What type of an investigation goes
12 on with respect to these Requests for Administrative
13 Remedies?
14     A    The people assigned to the
15 Administrative Remedy Office get every one of these
16 complaints and go out and investigate whether they
17 are meritorious or not.  They craft the response and
18 send it back to me, once that's final, for
19 signature.
20     Q    And what does the investigation entail?
21     A    They will go to the medical unit, they

Page 47

1  will go to whatever unit is typically primarily
2  responsible for the specific nature of the
3  complaint, and they will attempt to ascertain if the
4  complaint is meritorious or not.  And the response
5  will then be tailored accordingly.
6      Q    Who are these ARP investigators?  Who
7  are they?
8      A    Officers Calvin Jones and Raymond Wills.
9          And from time to time, the chief
10 investigator, Lt. Butler, and/or the intelligence
11 officer, Lt. Malloy, since that unit kind of
12 functions as one whole unit, may get involved in
13 handling any given ARP.
14     Q    So these officers speak with the medical
15 directors.  In this case, they would speak with the
16 medical director or the nurse or whomever to find
17 out what's going on with the complaint that's lodged
18 in these ARPs?
19     A    Yes.
20     Q    And if they don't have any medical
21 background or medical training, how can they -- and

Page 48

1  they are talking to somebody who is in the medical
2  field, how can they evaluate what the medical staff
3  is telling them?
4      A    They don't evaluate specific clinical
5  decisions by a doctor.  They evaluate that portion
6  of complaints over which we might have control, such
7  as seeing that an appointment is kept.  As to the
8  specific need for surgery or not, you're correct,
9  they don't evaluate that kind of thing because they
10 have no basis to do it.
11         MS. MALLON:  I'm going to show you what
12 I'd like to mark as Deposition Exhibit 3.
13         (Plaintiff Deposition Exhibit Number 3
14 was marked for purposes of identification.)
15     Q    Deposition Exhibit Number 3, for the
16 record, is a Maryland Division of Correction Request
17 for Administrative Remedy.  It's to the warden of
18 institution.  It was filed by -- or the inmate
19 request, Part A, is filed by Derek Simms.  It's
20 dated March 27, 2000.  In Part B, the response,
21 Warden Galley, is that your name or your signature

Page 49

1  that appears in Part B of the response?
2      A    Yes, it is.
3      Q    What's the date of that?
4      A    April 25, 2000.
5      Q    Okay.  Can you read into the record the
6  third sentence in that response?
7      A    You have received adequate medical
8  treatment for your condition.
9      Q    Okay.  Now, if these ARP officers don't
10 have medical background, don't have medical
11 training, how can they make a decision or render an
12 opinion that, in this case, Derek Simms has received
13 adequate medical treatment?
14     A    They are making a statement based on
15 what they are informed by the chief medical officer.
16     Q    Okay.  So, there is really no check and
17 balance, is there?  When they go to investigate this
18 complaint, they talk to the medical director and
19 what the medical director tells them, they take at
20 face value?
21         MS. LANE-WEBER:  Objection.  That's

13 (Pages 46 to 49)

Page 50

1  argumentative.
2      Q    You can answer the question.
3      A    They rely on the direction or statement
4  by the chief medical officer and neither they, nor
5  I, substitute or are in a position to substitute,
6  our judgment for what is adequate or not adequate.
7      Q    Are you finished?
8      A    Yes.
9      Q    So, in this case, if the medical
10 director, Dr. Tessema, says that Derek Simms has
11 received adequate medical treatment, these ARP
12 officers write this down, write this in this
13 response.  You have signed off on it.
14      Do you have -- what is your
15 responsibility in terms of verifying what is
16 contained in this response before you sign it?
17      A    For any given case, depending on the
18 nature of that case, if I have reason to go ask
19 questions in addition for clarification beyond what
20 is written by the ARP investigators, I will do that.
21      Q    Okay.  How about let's take this case.

Page 51

1  And keeping in mind that Derek, as you noted, is a
2  prolific ARP filer, and I reviewed his records and
3  he has filed over, from 2000 to 2003, he has filed
4  an ARP in at least each month of that three-year
5  period of time relating to his medical complaints.
6  Okay.
7      Based on that and based on this
8  information here, it would seem to me that you
9  wouldn't want to just take at face value what a
10 medical director says.  I mean, there seems to be
11 that there needs to be some type of check and
12 balance.
13      Otherwise, I mean, it seems as though
14 your signature here is a rubber stamp, a stamp of
15 approval of what Dr. Tessema says.  Is that
16 accurate?
17      A    No.
18      Q    It's not, okay.  So, what do you do to
19 verify the contents of what's contained in this
20 response?
21      A    In discussions I've had with Dr. Tessema

Page 52

1  and the clinical people down there, specifically
2  about Derek Simms, the nature of the treatment as
3  described to me appeared to be entirely reasonable
4  and I didn't have any reason to go beyond or
5  intercede further to attempt to have that
6  treatment -- have a second opinion obtained about
7  that treatment.  It seemed reasonable.
8      And all of these ARPs are based on those
9  discussions that I have had with medical people
10 about his treatment.
11      Q    Okay.  And so, the care seemed
12 reasonable notwithstanding the fact that you earlier
13 said you don't have any medical training and it's
14 not your job to second guess or override medical
15 judgments made by the medical director?
16      A    Is that a statement or a question?
17      Q    It's a question.
18      A    It's not my job to -- do you want to ask
19 that again?
20      Q    I'll rephrase it.
21      Earlier in this deposition you said that

Page 53

1  you don't have the medical training to override what
2  Dr. Tessema says is proper.
3      And now in this response, just a few
4  minutes ago, you said that you talked with
5  Dr. Tessema and if the care seemed reasonable, then
6  you thought that that was okay and you didn't find
7  the need to have a second opinion.
8      I'm just trying to understand that if
9  you don't have the medical training, how can you
10 determine that the treatment and care that an inmate
11 is receiving is reasonable?
12      A    I had no reason to believe that I needed
13 to go any further to seek an additional opinion, a
14 second opinion in this case, based on what
15 Dr. Tessema and the medical staff told me relative
16 to his treatment, the recommendations from
17 University Hospital, et cetera, et cetera.
18      And no, ultimately I cannot make a
19 sound -- any medical judgment because I'm not a
20 physician.  But what they did tell me seemed to be
21 reasonable given the circumstances that they relayed

Jon Galley - 4/7/04

Page 54

1  to me.
2      Q    Okay.  So, this statement in here:  You
3  have received adequate -- the statement in here, I'm
4  referring to Deposition Exhibit 3 in the Part B
5  response part.  The sentence that says:  You have
6  received adequate medical treatment for your
7  condition.  Is that accurate?
8      A    It's accurate to the best of my
9  knowledge, yes.
10     Q    In regard to this ARP, this Request for
11  Administrative Remedy, did you follow up -- do you
12  recall what you did to verify the contents of the
13  response in Part B?
14     A    I can't tell you that my discussions
15  with Dr. Tessema were in response to this specific
16  ARP.
17     Q    Okay.
18     A    But in general about his condition.
19  That statement is an indication by what I was told
20  by medical staff relative to his treatment over a
21  period of time relative to his specific condition.

Page 55

1  And that statement is reflective of my opinion that
2  it was adequate based on what they told me.
3      Q    When you had these discussions with
4  Dr. Tessema and other medical staff about Derek's
5  treatment, what was the substance of those
6  discussions?
7      A    What he had, what was the nature of the
8  treatment, if you have reviewed it, what's he being
9  prescribed, what's he do, what's he not do, is he
10  compliant.
11     Q    When did these discussions start
12  happening?
13     A    I don't know.  I can't give you a
14  timeframe on that.  It's some time ago.
15     Q    So, it's before this complaint was
16  filed?
17     A    I can't give you a date, a timeframe.
18     Q    Can you give me a number of times that
19  you met with the medical staff in regard to Derek
20  Simms' medical condition?
21     A    Not really.

Page 56

1      Q    Okay.
2      A    At least several.
3      Q    Okay.  During those meetings was it you
4  and -- who was involved at those meetings, if you
5  recall?
6      A    The doctor.
7      Q    Dr. Tessema?
8      A    Yes.
9      Q    Okay.
10     A    And I don't recall if the current
11  medical administrator was there or the previous one.
12  Probably -- well, no, the current one, at least, as
13  well as the previous medical administrator, who was
14  Rosalind -- I don't know her last name.
15     Q    Do you know what year this happened?
16  These meetings happened in?
17     A    They were before the actual lawsuit was
18  actually filed.
19     Q    Okay.  Are you finished with your
20  answer?
21     A    Yes.

Page 57

1      Q    How about from the time you started here
2  as warden?  How soon after, if you can recall, your
3  first meeting with Dr. Tessema and the medical staff
4  in regard to Derek Simms?
5      A    I can't recall that.
6      Q    Okay.  Looking back at Deposition
7  Exhibit 3.
8          Can you explain to me, up in the upper
9  left-hand corner, it says to:  Warden of
10  Institution.  And then there is a line next to
11  Warden of Institution and then below that is a line
12  and next to that it says Commissioner of
13  Corrections, and below that, Executive Director,
14  Inmate Grievance Office.
15          Do you see that?  Do you see up in the
16  upper left-hand corner?
17     A    Yes.
18     Q    I don't understand that.  I don't
19  understand, for example, if Derek Simms here, he
20  checked to warden of the institution.  Does that
21  mean that this Request for Administrative Remedy is

15 (Pages 54 to 57)

Jon Galley - 4/7/04

Page 58

1  referred to you?
2      A    As far as I know.  Why the X is there, I
3  don't know.
4      Q    Okay.
5      A    They have the option -- after a decision
6  from the institution, they have the option to
7  forward this on, then, to the Commissioner or to the
8  Grievance Commission.
9      Q    Okay.  But in the first instance, when
10 the -- but it seems to me that he could, he being
11 Derek, could direct this to any three of these
12 individuals or entities listed here.
13     A    They can and they do.
14     Q    Even at the first filing an initial
15 Request for Administrative Remedy?
16     A    They can, but typically if it's the
17 first filing, it will be returned to the institution
18 because it is a first filing.
19     Q    Okay. and then what happens when it's
20 returned -- so, for example, say Derek fills out a
21 Request for Administrative Remedy and it's to the

Page 59

1  Commissioner of Corrections and this is his first
2  Request for Administrative Remedy.
3          You're saying that, typically, the
4  Commissioner of Correction will return it to WCI or
5  is it referred to you?  What happens to that ARP?
6      A    It comes back to the institution.
7      Q    Okay.
8      A    At which time it's sent to the ARP
9  investigators to investigate.
10     Q    Okay.  And in filling out -- these ARP
11 officers, do you meet, do you talk with the ARP
12 officers about their response that they craft for
13 these ARPs?
14     A    Yes, I talk to them.  Do I talk to them
15 on every case about every response?  No, I don't.
16     Q    Okay.  How do you make the determination
17 whether you're going to follow up with an ARP
18 officer with respect to the response that appears in
19 Part B of these Administrative Remedies?
20     A    It's contingent on the issues involved,
21 it's contingent on the particular inmate

Page 60

1  involvement, it's contingent on whether I have
2  additional questions or additional information that
3  it appears that they didn't consider.  It depends.
4      Q    Has there ever been an occasion when a
5  response has been crafted, you look at it, you
6  follow up with the ARP officer who prepared the
7  response, and you follow up with the ARP officer,
8  you're not satisfied with the officer's
9  investigation, you ask the officer to go back and
10 further investigate and the officer comes back and
11 they revise what's contained in any response, now,
12 not this response?
13     A    Has there ever been an instance like
14 that?
15     Q    Right?
16     A    Yes, there has.
17     Q    Can you describe for one of those
18 instances?
19     A    I can't describe a specific instance.
20     Q    Okay.
21     A    I can tell you, generally, that on any

Page 61

1  given inmate if I might have additional information
2  of an intelligence nature that they may not know
3  about because of the sensitive, I may discuss the
4  matter with them to inform them of that and/or find
5  out if they were aware of that and whether that
6  would make any difference in their response.
7      Q    Okay.  What happens when an ARP -- and
8  I'm using ARP short for these Requests for
9  Administrative Remedy forms that are filled out by
10 inmates, when an ARP is dismissed, what happens
11 then?  What type -- what can the inmate do?
12     A    He then has the right of appeal to
13 headquarters and/or the Grievance Commission.
14     Q    What is headquarters?
15     A    Division of Corrections headquarters,
16 the Commissioner, which is why that block is there,
17 that line is on there to check off Commissioner.
18     Q    And say he appeals to the Division of
19 Correction, the Commissioner.  The Commissioner
20 dismisses or denies the appeal.  What then?
21     A    Then he has the option to go to the next

Jon Galley - 4/7/04

Page 62

1    level, the Executive Director of the Inmate
2    Grievance Commission.
3        Q    And then he takes that next step. At
4    that next step, the Executive Director of Inmate
5    Grievance -- is that the right term I'm saying?
6        A    Uh-huh.
7        Q    Denies or dismisses that appeal, what
8    then? Is that it?
9        A    Then he has the option to go the Circuit
10   Courts or he has the option to file 1983 Act.
11       Q    The appeal process that you just
12   described, is that designed for complaints against
13   medical staff?
14       A    It's designed for complaints about
15   anything.
16       MS. MALLON: Anything, okay.
17       I'm going to show you Deposition Exhibit
18   Number 4.
19       (Plaintiff Deposition Exhibit Number 4
20   was marked for purposes of identification.)
21       Q    This is, the letterhead says: State of

Page 63

1    Maryland, Department of Public Safety and
2    Correctional Services. It's a letter addressed to
3    Derek Simms dated May 28, 2002. It's re: IGO
4    Number 20020677. It's signed by Marvin N. Robbins,
5    the Executive Director.
6        Warden Galley, can you take a look at
7    the second paragraph of this letter? Can you review
8    that for me?
9        A    Review meaning read it?
10       Q    No, just review it to yourself.
11       A    Okay.
12       Q    Okay. Can you explain what is meant by
13   in this letter which states: I must advise you that
14   the jurisdiction of this agency is limited to
15   complaints against officials and employees of the
16   Division of Correction and Patuxent Institution.
17       And lastly: We do not have jurisdiction
18   over any complaints which you may have against them.
19       A    We do not have jurisdiction over any
20   complaints which you may have against them alluding
21   to his statement about not having jurisdiction to

Page 64

1    hear complaints over health care contractors.
2        Q    Right. So, the medical staff here, is
3    it contracted out with the State?
4        MS. LANE-WEBER: I'm sorry, would you
5    repeat that?
6        MS. MALLON: The medical staff here, is
7    it contracted with the State?
8        MS. LANE-WEBER: Is your question, is
9    the medical staff here provided by a contract which
10   is paid for by the State? I don't understand the
11   question. I'm not trying to be difficult.
12       Q    The medical staff, who hired the medical
13   staff that work at WCI?
14       A    Department of Public Safety.
15       Q    Who does the Department of Public Safety
16   have a contract with?
17       A    In this instance, Prison Health
18   Services.
19       Q    So, are all the Prison Health Services
20   employees at WCI, are they -- if a complaint was
21   lodged against any one of them, how would the

Page 65

1    complaint process -- what is the complaint process
2    here at WCI?
3        A    We have just discussed this for the last
4    half hour, I thought. An inmate can file an
5    Administrative Remedy, they can file a letter of
6    complaint, they can file an Inmate Grievance
7    Commission request, which is a response you just
8    handed me in this current exhibit, or they -- and
9    ultimately when they exhaust those remedies, they
10   can go to the Circuit Court and/or to the Federal
11   Courts under the 1983 Act.
12       Q    This letter seems to indicate to me that
13   in the Inmate Grievance Office, that that avenue is
14   not available to inmates who have complaints against
15   the medical staff here that work for -- that work at
16   WCI, but work for PHS; is that correct?
17       A    That's correct, but I don't have control
18   over the Inmate Grievance Office. Mr. Robbins will
19   have to answer that question as to why they deem it
20   that they have no authority to address complaints
21   about medical contracts.

17 (Pages 62 to 65)

Jon Galley - 4/7/04

Page 66

1    Q    Okay. Does the ARP process, when you
2  file an appeal -- but this is the end of the chain,
3  is it not, so to speak? When you file an appeal, if
4  an inmate files a grievance here, a medical
5  grievance at WCI, this is the last -- they have to
6  file the appeal all the way up to the Inmate
7  Grievance Office, correct? That's the last chain.
8    A    No, not in my opinion it's not the last
9  chain.
10    Q    Is it one of the steps in the appeal
11  process that they have to go through?
12    A    Yes, it is.
13    Q    Okay. This is in regard to Derek's
14  Crohn's disease. Are you familiar with just Crohn's
15  disease in general?
16    A    Yes.
17    Q    What it is?
18    A    Yes.
19    Q    Would you describe Crohn's disease as a
20  serious condition? Layman, as a serious condition?
21    A    It is potentially a serious condition

Page 67

1  depending on the individual involved.
2    Q    Do you believe that Crohn's disease can
3  be a painful condition?
4    A    Yes.
5    Q    Do you speak from -- do you have -- is
6  there anybody related to you that has Crohn's
7  disease?
8    A    I have Crohn's disease.
9    Q    Okay. Are you familiar with perianal
10  Crohn's disease?
11    A    No.
12    Q    Were you aware that before Derek filed
13  the instant Complaint that he believed the medical
14  staff was acting with deliberate indifference to his
15  Crohn's disease?
16    A    I am aware that he used those
17  statements. He made those statements.
18    Q    Okay. Were you aware that the staff
19  knew of Derek's Crohn's disease?
20    MS. LANE-WEBER: What staff?
21    MS. MALLON: What staff? Dr. Tessema.

Page 68

1    A    Yes, I'm aware that they know he has
2  Crohn's disease.
3    Q    And you indicated earlier that you had
4  conversations with, I believe it was Lt. Lancaster,
5  is that correct, regarding the single cell status,
6  the single cell issue?
7    A    Lt. Shreve.
8    Q    Lt. Shreve. What was that conversation?
9  What did Lt. Shreve say to you?
10    A    I inquired as to the housing status of
11  Derek Simms and was informed that he placed Derek
12  Simms in a single cell because, one, he happened to
13  have one available and, two, out of consideration for
14  his personal condition, personal medical condition,
15  just to make life easier for him.
16    It was not ordered by the medical
17  department. It was simply a decision made by the
18  housing unit manager, which he is empowered to do,
19  because he happened to have a single cell available.
20    Q    How many times has that happened before?
21  How many times has a housing unit manager with his

Page 69

1  authority allowed an inmate to be placed in a single
2  cell?
3    A    I can't give you a specific number. I
4  can tell you, generally, the housing units, we are
5  typically doubled celled, except for those cells in
6  areas that I've alluded to earlier. And that a
7  housing unit manager, if they happen to have a
8  single cell, is empowered to use that single cell
9  for whom whenever he deems it appropriate.
10    Q    During your time here at WCI, has
11  that -- has this ever happened other than this one
12  time with Lt. Shreve or any other housing unit
13  managers?
14    A    I'm sure it has, but I can't sit here
15  and tell you who, where, when, why and how.
16    Q    What made you inquire with Lt. Shreve
17  with respect to Derek's single cell? Why Derek was
18  in a single cell?
19    A    The specific question was in these
20  Interrogatories. I recalled --
21    Q    So, that's the first time -- go on.

18 (Pages 66 to 69)

Jon Galley - 4/7/04

Page 70

1    A    I recalled that I thought that he was in
2  a single cell and when I saw that allusion to not
3  being able to get a single cell, it surprised me
4  because I recalled, I thought, that he was in a
5  single cell and I had that discussion with the
6  lieutenant to verify that.
7      Q    Have you, since speaking with
8  Lt. Shreve, have you spoken with Dr. Tessema about a
9  medical order for a single cell?
10     A    No, I have not.  Well, no, that's not
11 correct.  In the discussions with Tessema about
12 Derek's case, he indicated to me that he didn't feel
13 there was any need for a specific single cell.
14     Q    Did you convey to him that Lt. Shreve
15 felt otherwise?
16     A    I probably conveyed to him that, in
17 fact, Derek was in a single cell.
18     Q    What was his reaction?
19     A    He really had no reaction, as I recall.
20     Q    Okay.  Do you think it's strange or --
21 do you think it's strange that a lay person,

Page 71

1  Lt. Shreve, would think that Derek needs a single
2  cell because of his condition and the medical --
3  Dr. Tessema doesn't believe that he needs a single
4  cell for his medical condition?
5      MS. LANE-WEBER:  Objection.  That hasn't
6  been the testimony here.
7      MS. MALLON:  It's a question.
8      MS. LANE-WEBER:  There has been --
9  Warden Galley did not say that Lt. Shreve thought
10 that Mr. Simms needed a single cell.  He said that
11 he accommodated him.  So, your question is not
12 consistent with the testimony that's been given.
13 It's changing it.
14     MS. MALLON:  Okay.  You can answer the
15 question.  I mean, it's noted, your concern.
16     MS. LANE-WEBER:  You can try.
17     A    Lt. Shreve made a housing decision based
18 on his ability to manage that housing unit.  He did
19 not make a medical decision.
20     Q    I understand.  Do you think it's
21 strange, however, that Lt. Shreve made a decision to

Page 72

1  accommodate Derek Simms with a single cell with his
2  medical issues and Dr. Tessema doesn't feel that he
3  needs a single cell because of his medical
4  condition?
5      A    No, I don't think it's strange.  The
6  lieutenant has a housing unit to manage and run.
7  Dr. Tessema makes medical opinions about housing as
8  it relates specifically to medical conditions.
9  Shreve did not make a medical decision, he made a
10 housing unit management decision.
11     Q    What was his housing unit management
12 decision based upon why Derek Simms should be in a
13 single cell?
14     A    I presume, and I don't pretend to speak
15 for the lieutenant, but I presume out of simple
16 personal consideration for that inmate and the fact
17 that he happened to have an empty cell on that tier.
18     Q    Okay.  Well, in the Interrogatory
19 Answers I recall the answer being that a lower bunk
20 and the fact that Derek Simms required a lower bunk
21 and that repeated dressing of his bed changes,

Page 73

1  repeated changes of his bed dressing.
2      MS. LANE-WEBER:  These were Answers to
3  Interrogatories by Warden Galley?
4      MS. MALLON:  Yes.  Under the single cell
5  question.  It's the first paragraph.
6      A    I assume that he was on a bottom bunk
7  before when he was double cell.  It's surprised me
8  to find that he had been in a single cell for as
9  long as he had because it was not a medical order.
10     The unit manager, as I indicate in that
11 Answer to Interrogatory, apparently had a discussion
12 with the physician.  But he, Shreve, then opted out
13 of personal consideration, to allow him to be housed
14 in that single cell.  It was not because, to my
15 understanding, of any medical order for a single
16 cell.
17     Q    Is it appropriate for unit managers to
18 accommodate inmates for medical conditions?
19     A    It is appropriate for a unit manager to
20 make the decision that Lt. Shreve made in order to
21 properly operate his housing unit as he sees it

19 (Pages 70 to 73)

Jon Galley - 4/7/04

Page 74

1  necessary to do for any given inmate.
2      Q    Are you aware of the conversation that
3  took place between Lt. Shreve and Dr. Tessema about
4  the single cell?
5      A    What's aware mean?
6      Q    When you spoke with Lt. Shreve about the
7  single cell of Derek Simms and being in a single
8  cell, did you inquire with him about him speaking
9  with Dr. Tessema about a single cell for Derek
10  Simms?
11      A    As I recall, the lieutenant indicated
12  that he had discussed Derek's case with the doctor.
13  That the doctor didn't order a single cell, but that
14  Lt. Shreve decided, on his own, to make both their
15  lives easier, I presume, his and Derek's, since he
16  happened to have a single cell that he would go
17  ahead and put him in a single cell.
18      Q    Do you have the power to order
19  Dr. Tessema to place in Derek Simms' file a medical
20  order requiring a single cell?
21      A    I have the authority to put any inmate

Page 75

1  in a single cell.  I will not use that authority to
2  overrule a physician and make a medical decision
3  about a single cell.  I will do it only if that
4  physician thinks it is best as part of the treatment
5  of that inmate to be in a single cell for
6  specifically medical reasons.  I will not assign an
7  inmate to a single cell specifically and only for
8  medical reasons.
9      Q    So, you have the power to do it, but you
10  won't do it because --
11          MS. LANE-WEBER:  Objection.  Is that
12  question a follow-up to the one you just asked him?
13          MS. MALLON:  It's a follow-up to his
14  answer.
15          MS. LANE-WEBER:  Okay.  Because Warden
16  Galley's answer was different from the question you
17  asked.
18          MS. MALLON:  He said he would not do it,
19  not that he can't do it.  And I'm asking does he
20  have the power to do it.
21          MS. LANE-WEBER:  To do what?

Page 76

1          MS. MALLON:  To order Dr. Tessema to
2  place Derek Simms in a single cell based on a
3  medical order.
4          THE WITNESS:  Is that your question?
5      Q    Yes.
6      A    No, I do not.
7      Q    You don't have the power to do that?
8      A    No, I would not do that.
9      Q    Do you have the authority to do that?
10      A    No, I don't think I do.
11      Q    Okay.
12          MS. LANE-WEBER:  Thank you.  I wasn't
13  trying to be difficult.
14          MS. MALLON:  I understand.
15          MS. LANE-WEBER:  I was trying to make
16  sure I understood the question before Warden Galley
17  answered it.  Thank you.
18          MS. MALLON:  No, that's fine.
19      Q    So, you have the authority to place
20  Derek in a single cell for a reason other than a
21  medical reason?

Page 77

1      A    Yes.
2      Q    What are those types of reasons?  Why
3  would you place Derek Simms in a single cell absent
4  a medical reason?
5      A    I have the authority to put any given
6  inmate in a single cell for reasons related
7  particularly to his and/or staff's safety.
8      Q    In terms of safety, health hazards?
9  What type of safety are you talking about?
10      A    An inmate may be extremely assaultive.
11  He may not be able to get along with any other
12  inmate.  For operational kinds of reasons of that
13  nature, I would exercise the authority to order
14  somebody to be housed in a single cell.  I would not
15  exercise that authority to order a single cell as a
16  specific part of medical treatment.
17          MS. MALLON:  Okay.  I'm going to show
18  you this and mark it as Deposition Exhibit Number 5.
19          (Plaintiff Deposition Exhibit Number 5
20  was marked for purposes of identification.)
21          (A discussion was held off the record.)

20 (Pages 74 to 77)

Page 78

1    Q    Warden Galley, in front of you is
2  Deposition Exhibit Number 5. I will describe it.
3  It's a Maryland Division of Correction Medical
4  Assignment. It's dated April 14, 2000. The name is
5  Derek Simms. The institution is the Maryland House
6  Annex. And down at the bottom, next to other, it
7  says that: Inmate should have single cell because
8  of medical condition.
9        Have you seen this document before?
10    A    No.
11    Q    Who would have seen this document here
12  at --
13    A    I presume, since the charts are reviewed
14  when they transfer from other institutions, the
15  medical unit looks at this, at those kinds of
16  documents. Or would have seen that document.
17    Q    Okay. Do you know who, ultimately --
18  when this recommendation is made, would Dr. Tessema
19  see this?
20    A    I assume so. I can't tell you whether
21  he did or not.

Page 79

1    Q    So, you wouldn't have any -- would you
2  have any say in whether Derek Simms should have a
3  single cell because of his medical condition?
4    A    I just answered that.
5    Q    I understand. Could you answer it,
6  again? That question?
7    A    I would not order a single cell based on
8  my authority, alone, for a specific medical reason
9  unless that physician ordered it as part of the
10  treatment for any given inmate.
11    Q    Thank you. What is Dr. Tessema like?
12    A    What is he like?
13    Q    In meeting with him do you find him to
14  be competent?
15    A    Yes, I do.
16    Q    Were you familiar with Dr. Wright, who I
17  understand, was Dr. Tessema's predecessor as medical
18  director at WCI? Did you know Dr. Wright?
19        Let me rephrase that. Were you warden
20  when Dr. Patricia Wright was the medical director of
21  Western Correctional Institution?

Page 80

1    A    No.
2    Q    Is narcotic pain medication as
3  prescribed for a medical reason permitted at Western
4  Correctional Institution?
5    A    Yes, it is.
6    Q    And who at Western Correctional
7  Institution has the authority to prescribe such
8  medication?
9    A    The attending physician.
10    Q    The attending physician? Is there only
11  one attending physician here at WCI?
12    A    Well, there is a primary physician,
13  which is Dr. Tessema and then there is various
14  specialists that come in such as psychiatrists and
15  whomever. Dentists.
16    Q    Okay. And when narcotic pain medication
17  is prescribed to an inmate, what is your
18  understanding of how it would be administered?
19    A    It's a controlled substance. It is not
20  given out in blister packs. It is on a watch/take
21  basis and they have to report to the dispensary to

Page 81

1  take it. Or if they're in Housing Unit 4, they must
2  take it under direct -- on a unit dose basis under
3  direct observation of medical staff.
4    Q    Did you hear from any of your housing
5  unit managers that Derek was complaining about his
6  pain because of his Crohn's disease between 2000 and
7  2003? At any time during that period of time?
8    A    I am aware of statements of his pain
9  that I can recall in various complaints that he
10  made.
11    Q    Okay. But you're only aware of that
12  through the complaints that he has filed?
13    A    I think so, yeah. I mean, I can't
14  recollect any discussions specifically about pain.
15    Q    Okay. Are you aware of how many inmates
16  currently take narcotic pain medication?
17    A    No.
18    Q    Do you have an estimate?
19    A    The last statistics indicated that there
20  were about nine percent of the population taking
21  psychotropics which are abusable drugs. How many

21 (Pages 78 to 81)

Jon Galley - 4/7/04

Page 82

1  specifically in pain medication, I can't tell you.
2          MS. MALLON:  Okay.  Let's mark this.
3          (Plaintiff Deposition Exhibit Number 6
4  was marked for purposes of identification.)
5      Q    I'm going go to show you Deposition
6  Exhibit Number 6.  And this Deposition Exhibit 6 is
7  a Maryland Division of Correction, Headquarters
8  Appeal of Administrative Remedy Response from Derek
9  Simms.  My question relates to Part B, the response.
10         Warden Galley, whose signature appears
11 in Part B of the response?
12     A    Frank Sizer's, but I don't think he
13 signed it.  I don't know whether the initials --
14     Q    PGJ?
15     A    PGJ, or whatever it is, I don't know who
16 that is.  It's a staffer at headquarters.
17     Q    Who is Frank Sizer?
18     A    He's the current Commissioner of
19 Corrections.
20     Q    And you don't think that he signed this?
21     A    Well, I am assuming that he didn't.

Page 83

1  Typically when there is a slash and initials, it
2  means that somebody signed his signature.
3      Q    Okay.
4      A    I don't know that to be fact.  Okay?
5      Q    Okay.  I'm interested in the last
6  sentence that appears in that paragraph beginning
7  with:  Prison Health Services is directed to hold a
8  patient care conference.
9          So, you, the warden, or in this case,
10 the current Commissioner of Corrections, assuming
11 that he authorize this PGJ to sign this response,
12 has the authority to direct Prison Health Services
13 to do certain things related to inmates' care at
14 Western correctional Institution?
15     A    You're assuming he has the authority to
16 do that?
17     Q    Well, that's my question to you.  In
18 this response, it seems to be that they're
19 directing -- that they're saying, they're being the
20 signature of the Commissioner, who Frank Sizer
21 current Commissioner of Corrections, that Prison

Page 84

1  Health Services is directed to hold a patient care
2  conference that is to include a discussion with you
3  of the chronic nature of your rectal discomfort.
4          I'm just trying to get an understanding
5  that WCI, that the correctional staff, that the
6  warden, has the authority to direct Prison Health
7  Services with respect to the treatment of certain
8  inmates here at WCI.  That certain treatments, or in
9  this case, certain conferences take place with
10 respect --
11         MR. CRAWFORD:  Objection.  I mean, I
12 think that what the document says is that it's a
13 patient care conference.  It's not directing
14 anything more than that.  I think you're reading
15 into that document things that it does not say.
16     Q    Okay.  I'll read the sentence as it's
17 written:  Prison Health Services is directed to hold
18 a patient care conference that is to include a
19 discussion with you of the chronic nature of your
20 rectal discomfort, the potential that you will never
21 be a hundred percent free of discomfort and a plan

Page 85

1  to promote your comfort and to provide you timely
2  medically necessary service for your legitimate
3  health care needs.
4          My question is:  Does WCI have the
5  authority to direct Prison Health Services to do
6  certain things related to the inmate's medical care
7  at WCI?
8      A    That statement does not indicate WCI's
9  directed to do anything.  That statement indicates
10 that the Commissioner of Corrections is directing
11 that Prison Health Services have a patient care
12 conference with Mr. Simms.  Does he have the
13 authority to do that?  Yes, he does.
14     Q    And what happens if Prison Health
15 Services doesn't hold that conference?  What would
16 happen?
17     A    Then the -- I presume the
18 Commissioner --
19         MS. LANE-WEBER:  If you know.
20         THE WITNESS:  I assume, the Commissioner
21 having directed it, would ask PHS why they didn't.

22 (Pages 82 to 85)

Jon Galley - 4/7/04

Page 86

1    Q    And if they weren't satisfied with
2    the -- I mean, can they sever the contract with
3    Prison Health Services at any time?  Can the State?
4    A    It's my understanding that the State
5    could do that for cause.  Whether or not not having
6    one patient care conference is cause is up for
7    debate.
8    Q    Okay.  Are you familiar with the Chronic
9    Care Clinic here at Western Correctional
10   Institution?
11   A    Yes.
12   Q    What is it?
13   A    Those inmates who have a chronic kind of
14   condition are seen on a regular basis in a Chronic
15   Care Clinic for that condition.
16   Q    Do you know if Derek Simms visits this
17   clinic?
18   A    No, I do not.
19   Q    Do you know who runs this clinic?
20   A    The medical service.
21   Q    Were and are you aware that Derek Simms

Page 87

1    takes sitz baths?
2    A    Yes.
3    Q    Were you aware that Derek was having
4    trouble using his sitz baths?
5    A    I am aware that that's one of the
6    considerations that Lt. Shreve considered to give
7    Derek access to a single cell.
8    Q    Because of the sitz bath?
9    A    Yeah, because of that -- the sitz bath
10   and as it is a matter of inconvenience to a cell
11   partner.
12   Q    And this question relates to the water
13   temperature that's available to Derek in his cell to
14   use a sitz bath.
15        Is the temperature that's available in
16   the cell -- is the water temperature that's in the
17   infirmary, is that temperature, can the water
18   temperature get hotter or higher in the infirmary
19   than in Derek's cell?
20   A    The water temperature on all of the
21   boiler -- hot water boilers in the institution is

Page 88

1    set at 120 degrees.  The boiler in Housing Unit 4 is
2    set at -- the water tank in Housing Unit 4 is set at
3    120 degrees.  The water tank in the infirmary that
4    serves the infirmary is set at 120 degrees.
5    Q    Can an inmate, then, running the hot
6    water in his cell get water temperature that's
7    120 degrees?
8    A    Like any water tank, depending on the
9    length of travel of hot water from the tank, the
10   temperature will diminish in varying degrees.
11   Q    What I'm trying to get at is if Derek
12   Simms wanted to use a sitz bath, would the
13   temperature, water temperature, that's available in
14   the infirmary, could he get a hotter temperature of
15   water using the sitz bath in the infirmary as
16   opposed to using the water that's available in his
17   cell?
18   A    I don't think it would be appreciably
19   different.
20        MS. MALLON:  I want to go off the record
21   a little bit and talk with Heather and maybe come

Page 89

1    back and have some follow-up questions.
2        MS. LANE-WEBER:  Okay.  I'll talk to my
3    client, then.
4        (There was a brief recess taken.)
5        MS. MALLON:  Go back on the record.
6    Three follow-up questions for Warden Galley.
7    Q    First, if an ARP officer, or you in your
8    investigation of an ARP, found that the medical care
9    was not reasonable, what would be your course of
10   action?
11   A    I would then have a conference with the
12   medical staff involved, listen to their reasons and
13   rationale, and depending on how strongly I felt
14   about it, I would either -- if I couldn't work it
15   out at this level, then I would then go to the
16   division level to the Director of Medical Services
17   for the division.
18   Q    Earlier in your deposition you mentioned
19   the idea of getting a second opinion.  Would that be
20   an option?
21   A    That's one possible option, yeah.

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

Jon Galley - 4/7/04

Page 90

1    Q    Would another option to be to refer to
2  send the inmate off-site to a specialist or surgeon?
3    A    That's another possible option.
4    Q    Okay. Is it unusual for a medical
5  director at one institution, for example, in this
6  case the Maryland House Annex, the document,
7  Deposition Exhibit 5, which recommends that Derek
8  Simms be placed in a single cell because of his
9  medical condition, is that unusual for that
10  recommendation not to carry over to the receiving
11  institution?
12    A    No, it's not unusual.
13    Q    How often does that happen?
14    A    Frequently.
15    Q    Is it appropriate for a housing unit
16  manager to take an otherwise healthy inmate and
17  place that inmate in a single cell if a single cell
18  is available?
19    A    It depends on the circumstances involved
20  and what that housing unit manager is facing in the
21  way of day-to-day management of that unit.

Page 91

1    Q    If the inmate is not a disciplinary
2  problem, if he's not having problems with his cell
3  mate and if he's a healthy inmate, is it unusual for
4  a housing unit manager to place that inmate in a
5  single cell if a single cell is available?
6    A    It depends on what that housing unit
7  manager is facing in the way of day-to-day
8  operations of that particular unit with that
9  particular inmate.
10    Q    I don't understand that answer.
11  Day-to-day operations. What type of issues could
12  the housing unit manager be facing or faces?
13    A    You're going to have to ask the housing
14  unit manager that. If it makes his life easier to
15  be able to manage that inmate on that particular
16  tier in the context of that whole housing unit, he
17  has the authority to take John Doe and put him in a
18  single cell if there is a single cell available.
19        It could be for a variety of reasons and
20  I don't typically substitute my judgment on a
21  day-to-day basis for that of a unit manager because

Page 92

1  I give them the authority to do that.
2    Q    How often has that happened during your
3  time here at Western Correctional Institution?
4    A    I can't give you a number. I have no
5  idea. It has certainly happened more than once and
6  probably more than a dozen times, but I can't give
7  you a number to that.
8        MS. MALLON: Okay. I think that's it.
9        MS. LANE-WEBER: I think I have one
10  question.
11        EXAMINATION BY MS. LANE-WEBER:
12    Q    Warden Galley, is it your testimony that
13  you do not have the authority to fire PHS employees?
14    A    Yes.
15        MS. LANE-WEBER: I have no other
16  questions. Warden Galley, do you want to read the
17  deposition?
18        THE WITNESS: Yes.
19        MS. LANE-WEBER: Thank you.
20        MR. CRAWFORD: I don't have any
21  questions. I just want to make sure that the

Page 93

1  exhibits are going to be attached to the deposition
2  and they're not, then you'll need to send me a set.
3        MS. MALLON: We'll attach them to the
4  deposition. And I would also like to use
5  consecutive document exhibits for each of the
6  depositions. If we could use these.
7        MR. CRAWFORD: That's fine. Meaning
8  that you're going to use the same exhibits each
9  time?
10        MS. MALLON: Right.
11        MR. CRAWFORD: Sure.
12        (A discussion was held off the record.)
13        (Deposition was concluded at 11:30a.m.)

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148