```
                                                                1

1            IN THE UNITED STATES DISTRICT COURT FOR

2                    THE DISTRICT OF MARYLAND

3                        (Northern Division)

4   DEREK L. SIMMS                  *

5     Plaintiff                     *

6   v.                              *   Civil Action No.:

7   ISAIAS TESSEMA, M.D., et al.,   *   02-CV-3276WMN

8     Defendants                    *

9                    *    *    *    *    *

10              DEPOSITION OF WILLIAM SONDERVAN

11       The deposition of William Sondervan, taken in

12  the above-captioned case on Wednesday, May 12th,

13  2004, commencing at 2:00 p.m., in the Office of the

14  Attorney General, St. Paul Plaza, 19th Floor, 200

15  St. Paul Place, Baltimore, Maryland 21202, and was

16  reported by Dawn M. Hyde, a notary public.

17

18                 EVANS REPORTING SERVICE

19             2 North Charles Street, Suite 950

20                 Baltimore, Maryland 21201

21                      (410) 727 7100
```

EXHIBIT 15

6

1  that would interfere with your ability to answer
2  truthfully to the best of your ability today?
3    A   No.
4    Q   And are you sick at all today?
5    A   No. Not that I know of.
6    Q   Is there any other reason that you can
7  think of that you wouldn't be able to answer my
8  questions today?
9    A   No.
10   Q   Would you please state and spell your full
11 name for the record.
12   A   William W. Sondervan, S-O-N-D-E-R-V-A-N.
13   Q   And where are you currently employed,
14 Mr. Sondervan?
15   A   I work at the American Correctional
16 Association as the director of professional
17 development.
18   Q   And is that a federal agency? I'm not
19 familiar with it.
20   A   It's a private nonprofit. It's a big
21 corrections organization, national organization.

7

1    Q   And you were formerly a commissioner with
2  the State of Maryland Department of Correction?
3    A   Yes.
4    Q   And during what time period were you the
5  commissioner?
6    A   Oh, I was the commissioner -- actually, I
7  started in late '98 -- January 1st, 1999, through
8  September something, 2003.
9    Q   And since leaving as the commissioner,
10 have you been involved with the organization you
11 previously mentioned, the nonprofit?
12   A   Yes.
13   Q   And prior to January 1st of 1999, what was
14 your position?
15   A   I was a deputy commissioner of correction
16 and before that I was assistant commissioner of
17 correction.
18   Q   And can you give me the time frame for
19 each of those positions?
20   A   I was -- I started -- became assistant
21 commissioner in August of 1994.

8

1    Q   And then when did you became the deputy
2  commissioner?
3    A   Well, I was acting for quite a while. I
4  think it actually became official -- I'm not really
5  sure, 1998.
6    Q   And then in 1999 you said you became a
7  commissioner.
8    A   Right.
9    Q   Again, just backtracking a little bit.
10 Mr. Simms, the plaintiff in this matter, is an
11 inmate at Western Correctional Institution.
12       Can you tell me, have you spoken with
13 anybody at Western Correctional Institution in
14 preparation for your deposition today?
15   A   No, I haven't.
16   Q   So you haven't spoken with Dr. Tessema?
17   A   I have not.
18   Q   Nurse VanMeter?
19   A   I have not.
20   Q   Warden Galley?
21   A   I have not.

9

1    Q   Or any other employees at Western
2  Correctional Institute?
3    A   Nobody.
4    Q   Did you review any documents in
5  preparation for your deposition today?
6    A   Yes.
7    Q   And can you describe for me what types of
8  documents those were.
9    A   That is -- what do we call this, an
10 interrogatory? It says, "The Defendant Former
11 Commissioner William Sondervan's Answers to
12 Interrogatories."
13   Q   And did you review any other documents
14 other than that?
15   A   No.
16   Q   And did you meet with anyone other than
17 your attorney in preparation for the deposition?
18   A   No.
19   Q   Now, we went over the time frame that you
20 were the commissioner and the assistant commissioner
21 and the deputy commissioner.

10

1   Can you tell me who succeeded you as the
2 commissioner in the Department of Correction?
3   A   I believe it was Frank Sizer.
4   Q   And what was your role and your
5 responsibilities during the time that you were
6 commissioner?
7   A   Well, commissioner is the person who is
8 overall in charge of the Division of Correction with
9 some exceptions.
10   Q   And would that mean that you were in
11 charge of Western Correctional Institution? Was
12 that under your umbrella, so to speak?
13   A   Yes.
14   Q   And did you supervise or oversee any
15 specific employees within your department or at the
16 various institutions? Were you in charge of
17 supervising specific people?
18   A   Well, the way the chain of command broke
19 down is I had either an assistant commissioner or a
20 deputy commissioner who was the regional
21 commissioner. Those regional commissioners

11

1 supervised the wardens. So I supervised the deputy
2 and assistant commissioners, I supervised the
3 headquarters staff, and those assistant deputy
4 commissioners supervised the wardens and our
5 institutions. There are 27 prisons around the
6 state.
7   Q   And would that mean then -- did you have
8 any direct contact during your time as commissioner
9 with the wardens at various institutions?
10   A   Yes, I did.
11   Q   Do you recall having contact with Warden
12 Galley, Jon Galley, who I understand to be the
13 warden at Western Correctional Institution?
14   A   Yes.
15   Q   And again, I know it's very hard to
16 describe, but generally what would your contact with
17 Warden Galley have been? What types of situations?
18   A   Multiple different situations. We would
19 meet every month, we would have a wardens' meeting
20 and we all get together and -- called "managing
21 officers' meetings," where all the wardens would get

12

1 together; we'd talk that. We talked about a variety
2 of issues. Everything from security to policy to
3 accreditations of certification, to construction.
4 You know, the whole gamut of things that you expect
5 the commissioner to talk to a warden about.
6   Q   Would those monthly warden meetings, did
7 they ever pertain to a particular inmate?
8   A   No.
9   Q   It was more a general --
10   A   General policy discussion level.
11   Q   Did you ever meet with the medical staff
12 at any of the 27 institutions through the state
13 during the time as commissioner?
14   A   I did but very seldom. Can I put this
15 into perspective and explain it for you.
16   Q   Certainly.
17   A   The medical is really one of the
18 exceptions that I did not have responsibility for.
19 Because the way that it works in the State of
20 Maryland is that because there are different
21 correctional entities -- now, let me explain this to

13

1 you.
2        You have the Division of Correction, which
3 is far and away the biggest; then you have Baltimore
4 City Detention Center, which is the city jail; then
5 you have Patuxent Institution, which is a
6 stand-alone institution with a very special mission.
7        You have three different-like correctional
8 organizations, so the department decided that they
9 would do a contract, a medical contract, that
10 covered all those entities, and that the medical
11 folks did not report to the commissioner of
12 correction nor the commissioner of pretrial nor the
13 director of Patuxent Institution.
14        That medical contractor reported to
15 somebody on the secretary's staff. So it bypassed
16 my chain of command and went to the secretary's
17 office.
18        So what would happen is at an institution,
19 the warden and his staff would deal with the medical
20 people on a daily basis to resolve problems, but the
21 formal chain of command for that contract -- and the

## Page 14

1 contract monitors bypassed the warden, bypassed the
2 commissioner and went directly to the secretary's
3 office.
4  Q  And again, I apologize, is that the
5 Secretary of State or is that --
6  A  No, Secretary of Public Safety and
7 Correctional Services.
8  Q  Thank you. And again, I just want to make
9 sure I understand your answer, and I appreciate the
10 explanation.
11     So is it your opinion or your position
12 that you don't have any responsibility or any
13 authority over medical personnel at the individual
14 institutions?
15  A  From a chain of command perspective, they
16 did not work for the commissioner of corrections;
17 they worked for the Department of Public Safety and
18 Correctional Services.
19     To say I had no responsibility for it is
20 not true. I mean we, had a staff relationship
21 responsibility. If something went on in our

## Page 15

1 institutions that needed attention, then we would
2 make sure that they got that kind of attention. But
3 in terms of the strict accountability and who they
4 report to, lines of command and control, they did
5 not report to us.
6  Q  If there were an instance where a medical
7 staff, a contract employee through one of these --
8 for instance, Prison Health Services I know has this
9 contract with Western Correctional Institute or with
10 the State for Western Correctional Institute.
11     If there was a problem with one of the
12 employees that warranted someone being fired -- and
13 again, we can give examples or discuss examples --
14 who then would be ultimately responsible for
15 addressing that employee's violation, whether it be
16 security or --
17  A  Well, the way that that works is the
18 warden is responsible for the institution and the
19 commissioner's responsible for all the institutions.
20 We're responsible for people coming in and out for
21 security, good order discipline and that sort of

## Page 16

1 thing.
2     If a medical contractor came into one of
3 the institutions and that person had drugs on them
4 or if they did something inappropriate or something
5 wrong, then it would be our responsibility to report
6 that up to the chain of command to the people who
7 are responsible for the medical contract.
8     You know, what we would do is if something
9 happened where a medical provider was caught
10 bringing drugs in or having improper relations with
11 an inmate or something like that, or bringing any
12 other kind of contraband into the institution, I
13 have the authority to bar them from coming into the
14 institution. But in terms of terminating them, that
15 went back to the contract monitor and ultimately to
16 the contractor to discipline him or to terminate
17 him.
18  Q  So what authority then, if any, would you
19 as commissioner have over a doctor or a nurse who in
20 their medical capacity didn't do something that you
21 deemed not up to snuff?

## Page 17

1  A  It was not my responsibility nor the
2 warden's responsibility to -- because we're not
3 medical doctors -- to determine what is appropriate
4 medical care or treatment. We have to rely upon the
5 doctors to do that, the medical staff to do that.
6  Q  So is there essentially no check in place
7 for a doctor who, again in the hypothetical,
8 improperly treated an inmate or did something
9 medically that was improper?
10  A  Well, yes. There's checks, but not with
11 us. That would go up through the contractor to the
12 contractor and through that chain of command, the
13 contract monitor's chain of command. That's how
14 that would work.
15  Q  Is there anyone -- would anyone within
16 your department be notified or is there simply no
17 involvement in that at all?
18     MS. LANE-WEBER: Notified of what?
19     BY MS. FOLEY:
20  Q  If there was some problem that you became
21 aware of, if a warden -- would any type of notice be

18
1 sent to the commissioner's office or would it
2 strictly be handled by the outside contractor?
3    A   It depends on what you're asking about.
4 If there was something where an inmate got violently
5 ill or the inmate died or something like that went
6 wrong, there would always be a notification that
7 would go from the warden to the commissioner. I
8 would know about it.
9        But then, you know, not my responsibility
10 to deal with it. If there was a medical issue, we
11 would know about it if it was something serious, but
12 it would go through that contractor chain of command
13 for resolution.
14    Q   So -- and again correct me if I'm wrong --
15 would it be your position that it's not within your
16 jurisdiction to handle such sort of complaint?
17    A   That's true.
18    Q   On a day-to-day medical type of issue?
19    A   That's correct. They are basically
20 operating in our institutions. We have
21 responsibility for security of the institution, but

19
1 in terms of their professional practice and care
2 that they give and that sort of thing, that goes to
3 the other chain.
4    Q   Are you familiar with Derek Simms, other
5 than obviously the filing of this lawsuit? Were you
6 familiar with Mr. Simms prior to that time?
7    A   No, I wasn't.
8    Q   Have you ever had, to your recollection,
9 any communications, either a verbal communication
10 directly with somebody regarding Mr. Simms?
11    A   I have not, not to my knowledge.
12    Q   And if I say -- again, based upon, I'm
13 assuming, your reading of the complaint or the
14 documents in this litigation, Mr. Simms has Crohn's
15 disease.
16        Are you aware that he has made several
17 sick call requests and administrative remedy
18 procedures related to some of those sick call
19 requests related to his Crohn's disease?
20    A   I wasn't aware of it prior to this.
21    Q   So prior to the lawsuit, you weren't aware

20
1 of it?
2    A   No.
3    Q   Have you, since the filing of this
4 lawsuit, reviewed any of those administrative remedy
5 procedures related to Mr. Simms? Any of those
6 documents?
7    A   I have not.
8    Q   Have you reviewed anything in his case
9 file or any other documents?
10    A   I have not.
11    Q   And I know we went over -- I'm sorry,
12 strike that.
13        Mr. Sondervan, are you familiar with
14 procedures or rules -- and I'm not sure what the
15 correct terminology is -- for providing an inmate
16 with a single cell?
17    A   Yes.
18    Q   And is that something as commissioner your
19 department is in charge of?
20    A   Yes.
21    Q   And can you explain to me what types of

21
1 rules or procedures are in place to deal with that
2 issue.
3    A   Are you talking from across the board or
4 are you talking just on medical issues?
5    Q   I mean, if you could focus on medical
6 issues, but I'm basically asking you to educate me
7 on the procedures or the rules that are in place.
8    A   Well, a big part of that is capacity. In
9 most of the institutions of the Maryland Division of
10 Correction are in fact double-cell because of the
11 capacity issues, the number of cells we have and the
12 number of inmates that we have.
13        Certain places for security reasons we
14 have single cells and certain people are placed in
15 single cells because they individually are a
16 problem.
17        If there's a medical issue and we're
18 advised by the medical staff that a particular
19 inmate should have a single cell for a specific
20 reason, you know, medical person or a psychiatric
21 person, then we comply with the request or the

**Page 22**

1 recommendation for a medical staff to do that.
2    For the most part, single cells are
3 determined by capacity and the number of inmates,
4 the security level and the construction design of
5 the given institution.
6    Q  So correct me if I'm wrong again. If a
7 medical director or a medical personnel at an
8 individual facility such as Western Correctional
9 Institution were to deem that an inmate needed a
10 single cell for a medical reason, would they file a
11 writing, would they notify somebody? What would be
12 the process to put that in place?
13    A  No. There would be discussions with the
14 medical staff who would interact with somebody at
15 the institution.
16    It's not the same exactly in every
17 institution because of different custody levels, but
18 the medical staff would either interact with a unit
19 manager or the security chief, the assistant warden,
20 the warden.
21    There would be, normally, a discussion.

**Page 23**

1 Sometimes it would be in writing, sometimes it
2 wouldn't be. But for the most part, if the medical
3 person recommends something, that's what would be
4 done.
5    Q  Does the warden have authority on his or
6 her own to do that at one of the institutions, to
7 institute a single-cell status for an inmate?
8    A  Yes.
9    Q  And for what reason would that be?
10    A  Well, the warden, by law and for practical
11 reasons, the warden is the managing officer who is
12 in charge of that particular institution. Wardens
13 are asked and given the authority to exercise their
14 judgment on the day-to-day operation of their
15 institution.
16    Q  And would it be the same types of reasons
17 that you articulated earlier? I mean,
18 considerations that would come into play, the
19 capacity and security and things of that nature?
20    A  Yes.
21    Q  I referred earlier to the administrative

**Page 24**

1 remedy procedures, or ARP. If I refer to them as
2 "ARP," will you understand what I'm referring to?
3    A  Sure, yes.
4    Q  Can you again generally explain to me the
5 process that's in place related to those procedures.
6    A  Sure. An inmate who has a grievance or
7 feels that -- he's not getting something he should
8 have or something is wrong or whatever the reason
9 is, they have a way to express that and they do it
10 through the ARP process, you know.
11    They will write up an ARP and lay out
12 their grievance. The grievance would normally go to
13 an ARP coordinator in that particular institution.
14 Then it would be researched and evaluated and it
15 normally goes to a warden for decision.
16    And then it would go back to the inmate
17 saying they found it favorable, they found it
18 unfavorable, they found it partially favorable,
19 whatever the case may be, and address the issue.
20    If in fact the inmate does not like the
21 answer that he or she received, then they could

**Page 25**

1 appeal that to the commissioner's office. And when
2 it comes to the commissioner's office where it would
3 be further evaluated and additional research if
4 necessary, then a decision would be made.
5    Now, those decisions were normally made --
6 because I had 24,000 inmates at 27 prisons, what we
7 normally would do is I would delegate that for the
8 most part to the regional commissioners to review
9 that.
10    Sometimes I did it myself. They would
11 take a look at the inmate's complaint, they would
12 look at the investigation and all the things that
13 were uncovered and make a reasonable decision based
14 on policy and on what's fair and reasonable. And
15 then that would go back to the inmate.
16    And if the inmate at that point still was
17 unhappy with the decision, they could appeal it to
18 the inmate grievance office. The inmate grievance
19 office then in turn goes through the same kind of
20 process where they would look at the complaint, they
21 would look at the warden's response, the

26

1  commissioner's response and they would make a
2  determination.
3      And if the inmate -- then I think that was
4  the last thing. After they went through all that,
5  then I think they can take it to the Circuit Court.
6  And I believe that's how the process works.
7  Q  So what I've understood you to just
8  describe is kind of a three-step or three-tiered
9  process where the warden at the institution level,
10 the commissioner as an appeal, and then the
11 grievance?
12 A  Right.
13 Q  The inmate grievance office or committee,
14 commission as an appeal above the commissioner?
15 A  Yes.
16 Q  Is there any way to kind of bypass or
17 forgo the process? For instance, does an inmate
18 ever file a complaint directly to the commissioner
19 and bypass the warden?
20 A  Well, we don't allow that. We have a
21 chain of command. When you have 27 prisons and

27

1  24,000 inmates, you can't let people violate the
2  chain of command because, you know, it wouldn't work
3  properly, you'd be overwhelmed and you'd take the
4  person out of the loop who really knows the answer.
5      If something happens, I'm sitting in my
6  office, I have 27 prisons all over the state, how do
7  I know what happened in some prison that's 200 miles
8  away? The warden is the person who's responsible
9  for it. He works there, he's closest to it. That's
10 why it goes to him first.
11 Q  So in any ARP situation and one that's
12 filed by an inmate, it first goes to the warden; is
13 that a fair statement?
14 A  Yes.
15 Q  If an ARP is appealed to the commissioner
16 level, what does your office -- and again, I
17 understand you delegate to your regional
18 commissioners -- what is the process to investigate
19 or to verify the validity or not of the complaint
20 and how do you assess it?
21 A  Well, it goes to different -- people are

28

1  assigned different roles and responsibilities in the
2  DOC headquarters depending on what it is. It's a
3  security issue, it's a case management issue, it's a
4  classification issue, it's a commitment issue or a
5  medical issue.
6      And then it goes to the appropriate person
7  who would take a look at the facts, somebody with
8  the background and the expertise to assess it. And
9  they would read what the complaint is and they would
10 take a look at what the warden said in his
11 investigation. They would look at the documentation
12 and supporting evidence and make a determination
13 from there. If they had to, they would do further
14 research or ask further questions depending on what
15 the issue was.
16 Q  You've just referred to "documentation and
17 supporting evidence."
18     Does the warden or the institution provide
19 you with some packet of information or something
20 related to the ARP? I mean, how does the
21 commissioner's office get the background?

29

1  A  Well, it would come from the initial ARP
2  from the warden's office, whatever documentation was
3  available. And some of them have no documentation
4  and others do have documentation.
5      For example, somebody talks about they
6  lost their clothing or their property was damaged,
7  they look for receipts and things to justify what
8  they're saying. That sort of thing.
9  Q  And you also in your response a moment ago
10 referred to a medical issue. Can you explain to me
11 specifically how they would be handled at the
12 commissioner's level from an appeal or from an ARP?
13 A  Well, an appeal from an ARP on a medical
14 issue because medical wasn't under the commissioner
15 didn't go to the commissioner. It went to the
16 person who was responsible, the contract
17 administrator who handled the medical issues. It
18 really wasn't the commissioner's call.
19 Q  Do you know who that person currently is
20 or who that person was during the time you were in
21 office acting as commissioner?

54

1  down the chain of command to make sure that the
2  process flows smoothly.
3    Q   And is all that laid out in this inmate
4  orientation or this handbook so the inmates are
5  aware of this?
6    A   It's all laid out in the Division of
7  Correction Directive which is very specific, and the
8  inmates have access to that.
9        Now, the inmate handbook talks to that.
10 It may be not to the same amount of detail, but I
11 think in the inmate handbook it tells you where to
12 go to find additional information if you want to,
13 and those DCDs are available to inmates. They're in
14 the libraries in each institution.
15   Q   And again, going back to what we were
16 discussing, single cells and reasons for providing
17 single cells, if an inmate is transferred from one
18 institution to another within the Department of
19 Correction for whatever reason, an inmate at the
20 first or the initial institution is housed in a
21 single cell and they -- when they're transferred to

55

1  this other institution, there's some sort of
2  documentation indicating that they were a single
3  cell and recommending a single cell at the latter
4  institution.
5        Is that typically followed?
6    A   It depends on the circumstances. There
7  are just so many different circumstances involved.
8  The inmate may be at an institution where they have
9  single cells and he's transferred for one reason or
10 another to an institution where they don't have
11 single cells. So, I mean, there's no one answer to
12 that question. I don't know how else to say that.
13       Are you talking about medical reasons?
14   Q   I mean for any reason. Assuming both
15 institutions have single cells.
16   A   Let me give you an example. For example,
17 an inmate is at the Maryland House of Correction
18 Annex, which is a maximum security institution,
19 which for the most part is single cell because of
20 the dangerousness of the inmates.
21       That inmate goes before a review process

56

1  and his custody level is decreased from maximum
2  security to medium security and he goes to another
3  medium security institution where they only have
4  double cells. Well, he'll go from single cell to
5  double cell.
6        And there's a multitude of different
7  variations. These are all -- this is very complex.
8  There's not a simple, single answer to cover that.
9    Q   Assuming both institutions have single
10 cells and there's a medical reason, some sort of --
11 let me take a step back.
12       Is there then some sort of medical
13 directive or something placed in the inmate's file
14 that says, "This person needs a single cell"?
15   A   Let me clarify it. The inmate is at an
16 institution and he's in a single cell for a medical
17 reason that's documented. He is then transferred to
18 another institution, would that documentation follow
19 him and it would it be read and would it be
20 followed? In that particular case the answer is it
21 should be, yes.

57

1    Q   And this documentation, medical
2  documentation, what does it take in an inmate's file
3  to document medically the need for a single cell?
4  Is it a letter from the doctor, is there a specific
5  form?
6    A   Again, the medical procedures weren't mine
7  so I'm not exactly sure. It could be an annotation
8  in their file, it could be a letter. I would
9  imagine it could be different things.
10   Q   If an inmate were transferred from one
11 institution to another, and for a medical reason
12 there was documentation of some sort in the file
13 that this inmate for a medical reason was in a
14 single cell; and at this second institution the
15 inmate was not placed in a single cell, what would
16 then happen if that instruction weren't followed?
17   A   I would just have to say normally that it
18 would be followed, and the only reason that it
19 wouldn't be followed is if there were some other
20 intervening circumstances or opinion from another
21 doctor or, you know, something along those lines.

58

1 But again, the warden has great discretion
2 on that, but generally speaking, they would obey the
3 doctor's orders. That's pretty much what happens
4 across the board.
5    Q   So would you be surprised if an inmate
6 transferred from one institution to another, had a
7 medical directive indication in his file that he
8 needed a single cell for a medical reason, and at
9 the second institution would you be surprised if
10 there was a single cell available that that inmate
11 were not put in a single cell?
12    A   I think that's accurate.
13    Q   Are you aware of Derek Simms' current
14 housing situation?
15    A   Only from this document that we were
16 talking about earlier.
17    Q   And what is your understanding of that
18 situation?
19    A   As I've been briefed on it, he's in a
20 single cell at Western Correctional Institution, I
21 think in housing unit 1, D tier, in a single cell.

59

1    Q   And what is your understanding of why he's
2 in a single cell?
3    A   Because of his medical condition.
4    Q   So it's your understanding that he's
5 housed in a single cell based on a medical
6 condition?
7    A   That's what I was briefed on, yes.
8    Q   Would that mean then -- assuming that's
9 true, would that mean that next week he could be
10 moved from that single cell?  I mean, what would
11 change, I guess; and I know there's a whole host of
12 reasons.  I mean, other inmates could come in, that
13 kind of thing.
14       What type of situation would Mr. Simms
15 lose -- and I don't want to say right, but the
16 access to that single cell?
17    A   Well, if he was in the single cell for a
18 medical reason, I think the primary reason he would
19 be changed is due to a change in his medical
20 condition, a different -- you know, an update or a
21 different diagnosis from the medical doctor.

60

1    Q   So is it fair to say then it's at the
2 discretion of the medical doctor as to whether he's
3 housed in a single cell or not?
4    A   If the medical doctor, you know, states to
5 the warden and his staff that the inmate should be
6 single-celled due to a medical condition, he will
7 probably be there, yes.
8    Q   I know you had -- in answering that you
9 referred to the document we've referred to before,
10 which I believe was your answer to interrogatories.
11       MS. FOLEY:  If I could mark a copy of that
12 as Exhibit No. 5.
13       (Sondervan Deposition Exhibit No. 5 was
14 marked for identification.)
15       BY MS. FOLEY:
16    Q   I'm going to hand you Exhibit No. 5, which
17 is your "Defendant Former William Sondervan's
18 Answers to Interrogatories."  Case caption is "Derek
19 Simms versus Isaias Tessema, et al."
20       And if I could just direct your attention
21 to -- well, first, if you look at page 11, there's

61

1 an affirmation, Mr. Sondervan.  Is that your
2 signature?
3    A   Yes.
4    Q   And if you could direct your attention to
5 page five.  And I believe the question starts on the
6 preceding page four if you want to review.  It's
7 interrogatory number ten.
8    A   Okay.
9    Q   And again, if you just want to review your
10 answer, which is on page five to interrogatory
11 number ten.
12    A   Okay.
13    Q   And if I can direct your attention to the
14 first full paragraph, the last sentence that begins
15 with, "Secondly."  The last sentence of the first
16 full paragraph.
17    A   Okay.
18    Q   And I'll again read it into the record,
19 "Secondly, since he has a requirement to regularly
20 change dressing due to his medical condition, the
21 unit manager, in consultation with the treating

62

1 physician, opted to house him in a single cell."
2  Is this referring to Derek Simms? Is this
3 answer of yours referring to Derek Simms?
4  A  Yes.
5  Q  And can you tell me -- you identified a
6 consultation between the unit manager and the
7 treating physician. Do you know who those parties
8 were? Who was the unit manager that you were
9 referring to?
10  A  I believe it's stated in this document.
11  Q  Do you know -- would you be able to point
12 that out to me?
13  A  Let me look and see. Again, I had 8,000
14 employees. I don't know them all.
15  Q  I understand. Please take your time.
16  A  This would be Dr. Tessema, and the housing
17 unit manager would be Lieutenant Shreve.
18  Q  Okay. So your understanding is there was
19 a consultation between Dr. Tessema as the treating
20 physician and Lieutenant Shreve as the unit manager?
21  A  That's what I was briefed on.

63

1  Q  And when you say you were briefed on,
2 again, I'm not asking about communication with your
3 attorney, but did you speak with someone else?
4  A  I spoke with no one other than my
5 attorney.
6   MS. FOLEY: I believe that's all. I don't
7 know if anyone has any follow-up questions or if
8 Mr. Crawford has any.
9   MR. CRAWFORD: No follow-up questions
10 here.
11  BY MS. FOLEY: Or if Ms. Weber has some.
12   EXAMINATION
13  BY MS. LANE-WEBER:
14  Q  In the last part of the questions that
15 were directed to you, Mr. Sondervan, you were asked
16 about the administrative remedy process regarding
17 inmate medical complaints, correct?
18  A  Yes.
19  Q  When you were talking about the inmate's
20 medical complaints and the ARP process, my
21 understanding is that you were referring to medical

64

1 complaints against the medical contract providers;
2 is that accurate?
3  A  Yes.
4  Q  If an inmate had a medical complaint
5 against a correctional person, would he be able to
6 file a complaint about that through the ARP process?
7  A  Yes.
8   MS. LANE-WEBER: I have no further
9 questions.
10   MS. FOLEY: Can I just ask one follow-up
11 again to clarify.
12   FURTHER EXAMINATION
13  BY MS. FOLEY:
14  Q  Dr. Tessema is not a Western Correctional
15 Institution employee; he's a contract employee
16 through Prison Health Services; is that correct?
17  A  That's correct.
18  Q  And Nurse Denise VanMeter is not a Western
19 Correctional Institution employee; she's an employee
20 through the contract with Prison Health Services; is
21 that right?

65

1  A  I believe that's the case too.
2  Q  Are there any medical staff -- and I'm
3 using that word -- that are employees of Western
4 Correctional Institution or the Department of
5 Correction? Would there be a medical staff member?
6  A  The only medical staff that are not under
7 the contract that work for the Division of
8 Correction and the department as employees are Ph.D.
9 clinical psychologists and psychological associates,
10 but they're not -- you know. I don't know how you'd
11 characterize that. They're not strictly medical
12 staff but they do psychological things.
13  Q  So they're -- my understanding, Dr. Ehlers
14 at Western Correctional Institution, my
15 understanding is that he's the psychologist there.
16  So he then would be an employee of the
17 Department of Correction?
18  A  No, I don't know him. In this specific
19 case, I'm not sure, but the psychologists are
20 employees. Psychiatrists are normally under the
21 contractors to the best of my knowledge.